**COMPREHENSIVE TECHNOLOGIES INTERNATIONAL, INCORPORATED, Plaintiff–Appellant,**

v.

**SOFTWARE ARTISANS, INCORPORATED; Marshall Dean Hawkes; Igor A. Filippides; Randall L. Sterba; Richard T. Hennig; David R. Bixler; Alvan S. Bixler, Defendants–Appellees,**

and

**Mark A. Hawkes, Defendant.**

No. 92–1837.

United States Court of Appeals, Fourth Circuit.

Argued March 30, 1993.

Decided Aug. 25, 1993.

Opinion and Judgment Vacated and Case Dismissed on Petition for Rehearing Sept. 30, 1993.

Cynthia Lee Clark, Chantilly, VA, argued, for plaintiff-appellant.

Philip A. Gagner, Shaughnessy, Borowski & Gagner, Washington, DC, argued (Robert J. Zeknick, Szabo, Quinto, Zelnick & Erickson, P.C., Woodbridge, VA, on brief), for defendants-appellees.

Before HALL, MURNAGHAN, and WILLIAMS, Circuit Judges.

## OPINION

WILLIAMS, Circuit Judge:

Comprehensive Technologies International, Inc. (CTI), brought this action for copyright infringement against former employees Dean Hawkes, Igor A. Filippides, Randall L. Sterba, Richard T. Hennig, and David R. Bixler (the Defendant employees). CTI also named as defendants Alvan S. Bixler and Software Artisans, Inc. (SA), a corporation formed by Alvan Bixler and several of the Defendant employees shortly after their departure from CTI. CTI contended that "Transend," a computer program developed by the Defendants, infringed upon the copyrights CTI held in its "Claims Express" and "EDI Link" computer programs. CTI appended numerous state law causes of action, including trade secret misappropriation, breach of confidentiality, and breach of contract.[1] CTI also alleged that Hawkes

---

1. CTI also alleged intentional interference with economic relations, breach of fiduciary duty, conspiracy to induce breach of contract, and statutory conspiracy, but dismissed these claims voluntarily and with prejudice at the close of its case. CTI also named former employee Mark A. Hawkes as a defendant, but dismissed all of its

breached his covenant not to compete with CTI by performing services for SA, soliciting CTI's customers, and hiring CTI's former employees. After a bench trial, the district court entered judgment for the Defendants on all counts.

CTI now appeals and offers four reasons for reversal. First, CTI contends that, in granting judgment for Defendants on its copyright infringement claim, the district court failed to apply the appropriate standard for determining whether Transend is substantially similar to Claims Express and EDI Link. Second, CTI contends that under the Virginia Uniform Trade Secrets Act, Va. Code Ann. § 59.1–336 to –343 (Michie 1992), the district court erred in finding that Defendants did not misappropriate its trade secrets. Third, CTI challenges the district court's conclusion that Hawkes's covenant not to compete with CTI is unreasonable and hence unenforceable under Virginia law. Last, CTI charges that the district court committed reversible error by expressing "bias" against its software.

With regard to CTI's copyright infringement and trade secret misappropriation claims, we affirm the judgment for the Defendants. We agree, however, with CTI's contention that Hawkes's covenant not to compete is enforceable. We therefore vacate the judgment for Hawkes on CTI's claim for breach of contract, and remand for the district court to determine whether Hawkes has breached his covenant not to compete. We find CTI's charge of bias to be without merit.

I.

*Factual Background*

CTI, a California corporation with its principal place of business in Chantilly, Virginia, is engaged in defense related services. CTI was founded in 1980 by Celestino Beltran, who at the time of trial served as CTI's president, chief executive officer, and chairman of the board of directors. By 1988 Beltran was hoping to diversify CTI's operations into newly emerging technologies. At that time, Beltran's next door neighbor, Al-

van Bixler, worked for the Electronic Data Interchange Association (EDIA). Electronic data interchange, or EDI, is the computer-to-computer transmission of business transactions in proprietary or standard formats. After discussing EDI with Alvan Bixler and conducting his own research on the subject, Beltran concluded that EDI technology presented substantial growth potential in the small business market.

With the approval of his board of directors, Beltran established a Software Products Group and designated Dean Hawkes to lead it. Hawkes was given the responsibility to design, develop, test, and market software that would enable clients to process and transmit data through EDI technology. CTI selected Igor Filippides as the Software Products Group's Acting Vice President for Sales and gave him primary responsibility for marketing the software. Other members of the Software Products Group included Sterba, Hennig, and David Bixler, who together wrote the actual software. To boost the marketability of its products, CTI obtained an agreement from EDIA to assist CTI in the development of its software. Pursuant to that agreement, Alvan Bixler collaborated with CTI as a consultant on EDI technology.

Each of the Defendant employees except Hawkes signed CTI's standard Confidentiality and Proprietary Information Agreement. Under the Agreement, each employee agreed not to disclose or use, directly or indirectly, during his employment and for three years thereafter any confidential, proprietary, or software-related information belonging to CTI. The Agreement specifically identified the Claims Express and EDI Link projects as confidential. Although Hawkes did not sign a Confidentiality and Proprietary Information Agreement, he did sign an Employment Agreement that contained similar but more restrictive provisions. In addition to promising confidentiality, Hawkes agreed that during the term of his employment he would not compete with CTI, solicit CTI's

claims against him. He is not a party to this    appeal.

customers, or employ CTI's current or former employees.

The Software Products Group undertook to develop two software packages for personal computers. The first, Claims Express, is an electronic medical billing system. Claims Express transmits information that conforms to two specific insurance claims forms, the "HFCA 1500" and the "UB 82." The program has been successfully marketed. CTI's second software package, EDI Link, is not specific to the health care industry. It is designed to permit users to create generic forms, enter data on the forms electronically, test that data for errors, and store both the forms and the data on a computer. Although CTI expended substantial effort on EDI Link, at the time of trial the program had not been completed and had never been sold or marketed. Trial testimony indicated that between 35 and 85 percent of the program had been completed.

In February 1991, all of the Defendant employees left CTI. Hawkes executed a formal Termination Agreement with CTI. In that Agreement, Hawkes agreed to rescind his Employment Agreement in return for $50,000 and more than $20,000 worth of equipment. Hawkes also agreed that he would not disclose or use CTI's confidential information, and that, for a period of one year following his departure, he would not (1) compete with CTI, (2) solicit CTI's customers, or (3) hire CTI's employees.

In April 1991, the Defendants incorporated Software Artisans, Inc., located in Fairfax, Virginia. By July 1991, SA had developed and begun to market its own program called Transend. According to its User's Manual, Transend creates a "paperless office environment" by enabling its users to process business forms on a computer. (J.A. at 1592.) Transend is similar to Claims Express and EDI Link in that it is designed to prepare forms for transmission by EDI. Transend permits the user to input data, check the data for errors, and prepare the data for transmission by EDI.

## II.

### Copyright Infringement

The district court concluded that Defendants did not infringe upon CTI's copyrights in Claims Express and EDI Link. See 17 U.S.C.A. § 501(a) (West Supp.1993) (defining copyright infringement). The court found that Transend was not a literal copy of either Claims Express or EDI Link, see Computer Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d 693, 701 (2d Cir.1992) (literal copying can prove infringement), nor was it substantially similar to either program, see Dawson v. Hinshaw Music, Inc., 905 F.2d 731, 732 (4th Cir.1990) (access and substantial similarity can prove infringement), cert. denied, 498 U.S. 981, 111 S.Ct. 511, 112 L.Ed.2d 523 (1990); Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc., 797 F.2d 1222, 1232 (3d Cir. 1986), cert. denied, 479 U.S. 1031, 107 S.Ct. 877, 93 L.Ed.2d 831 (1987). The district court acknowledged that under Whelan CTI could prove infringement by showing substantial similarities between the structure, sequence, and organization of the programs, but found that CTI had not met its burden of proof on that issue. The court accepted CTI's evidence that the programs shared some characteristics but nonetheless found that the similarities were either derived from common sources available to the average programmer or were dictated by the functions of the programs. The court also found that, to the extent that CTI may have possessed proprietary algorithms,[2] Defendants had not copied any of them.

CTI contends that the district court failed to apply the correct test to determine substantial similarity and therefore erred in concluding that the structure, sequence, and organization of Transend were not substantially similar to that of Claims Express and EDI Link. We review the district court's factual findings on substantial similarity for clear error, Data East USA, Inc. v. Epyx, Inc., 862 F.2d 204, 206 (9th Cir.1988); Whelan, 797 F.2d at 1233 n. 25, and we review its conclusions of law de novo, Whelan, 797 F.2d at 1233 n. 25.

CTI points out that the district court criticized the Whelan test of substantial similari-

---

2. An algorithm is a mechanical computational procedure. Whelan, 797 F.2d at 1229.

ty as overly simplistic,[3] but never stated which alternative test should be used to evaluate substantial similarity. CTI believes that the district court should have applied the Second Circuit's "abstraction-filtration-comparison" analysis, first announced in the *Computer Associates* opinion. *Computer Assocs.*, 982 F.2d at 706–12. CTI argues that if the district court had used the *Computer Associates* test, it would have identified six similarities between Transend and the CTI programs:

    (1) the organization of data dictionary in the data base;

    (2) the establishment of form data;

    (3) the use of the header file name "username.rec";

    (4) the unique identifiers in the sort record;

    (5) the use of 41 characters for the key length to accommodate names and addresses; and

    (6) some of the field names.

(CTI's Br. at 11.) According to CTI, these similarities prove infringement.

    ■ The difficulty with CTI's position is that it has not identified any evidence in the record indicating that these similarities were proved at trial. We will not sift through the record to piece together support for CTI's contentions.[4] *See* Fed.R.App.P. 28(a)(4), (e) (appropriate references to the record are required); *Friedel v. City of Madison*, 832 F.2d 965, 969 (7th Cir.1987) ("It is not the court's duty on appeal to wade through the record and make arguments for either party."); *AMP, Inc. v. Fleischhacker*, 823 F.2d 1199, 1203 (7th Cir.1987) ("We will not search through the record in an endeavor to locate material which the parties have failed to provide us. It is neither the role nor the obligation of an appellate court to cast about in the record for facts and argument upon which the parties may rely." (Internal quo-

tation marks and brackets omitted).) Because CTI has not identified any evidence demonstrating that the district court clearly erred, we affirm the district court's finding that Transend was not substantially similar to either Claims Express or EDI Link.[5]

## III.

*Trade Secrets*

The district court also found that CTI did not prove that the Defendants misappropriated a trade secret. Under Virginia law a "trade secret" is

information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process, that:

1. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

2. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Va.Code Ann. § 59.1–336; *see also Dionne v. Southeast Foam Converting & Packaging, Inc.*, 240 Va. 297, 397 S.E.2d 110, 113 (1990) (discussing definition of trade secret). For purposes relevant to this case, "misappropriation" means the "use of a trade secret of another without express or implied consent by a person who ... [a]t the time of ... use, knew or had reason to know that his knowledge of the trade secret was ... [a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." Va. Code Ann. § 59.1–336.

    ■ In denying CTI's claim for trade secret misappropriation, the district court found that CTI did not possess any trade secrets and that, even if CTI did possess trade secrets, the Defendants had not misap-

---

**3.** Other courts share the district court's criticisms of the *Whelan* test. *See, e.g., Computer Assocs.*, 982 F.2d at 705.

**4.** The Joint Appendix was itself in excess of 3400 pages. We note, however, that Defendants's expert, Dr. Rotenstreich, whose testimony the district court credited, testified that there was noth-

ing in the source code of Transend that indicated that it had been copied from either EDI Link or Claims Express. (J.A. at 600.)

**5.** In light of our disposition, we need not decide whether to adopt the *Computer Associates* test for copyright infringement of computer programs.

propriated them.[6] The court found no evidence that CTI's purported trade secrets—the organization of Claims Express and EDI Link, the database access techniques of the two programs, and the unique identifiers of the two programs—derived independent economic value from not being generally known or were not readily ascertainable by proper means. Consequently, the court concluded that CTI's purported trade secrets failed to satisfy all of the elements necessary to prove a trade secret. The district court also concluded that the Defendants did not "copy" any trade secrets, implying that Defendants did not "use" or otherwise misappropriate them.[7] (J.A. at 65.)

CTI argues that in granting judgment for Defendants on its trade secrets claim, the district court misapplied the law. Although we review the district court's determination that a trade secret does not exist for clear error, *Integrated Cash Management Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir.1990); *Telex Corp. v. International Business Machs. Corp.*, 510 F.2d 894, 928 (10th Cir.), *cert. dismissed*, 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975); *K–2 Ski Co. v. Head Ski Co.*, 506 F.2d 471, 477 (9th Cir.1974), we independently review the district court's conclusions of law and the court's application of the law to the facts, *Rawl v. United States*, 778 F.2d 1009, 1014 & n. 9 (4th Cir.1985), *cert. denied*, 479 U.S. 814, 107 S.Ct. 67, 93 L.Ed.2d 25 (1986).

■ CTI reads the district court's opinion as ruling as a matter of law that the organization of its database, its database access techniques, and its unique identifiers could not constitute trade secrets because each of their composite elements was in the public domain. CTI argues vociferously (and correctly) that although a trade secret cannot subsist in information in the public domain, it can subsist in a *combination* of such information, as long as the combination is itself secret. *See Integrated Cash Management*, 920 F.2d at 174; *Continental Data Sys., Inc. v. Exxon Corp.*, 638 F.Supp. 432, 443 (E.D.Pa.1986); *Q–Co Indus., Inc. v. Hoffman*, 625 F.Supp. 608, 617 (S.D.N.Y.1985); *Dickerman Assocs., Inc. v. Tiverton Bottled Gas Co.*, 594 F.Supp. 30, 35–36 (D.Mass.

**6.** The district court also stated that CTI's trade secrets claims were "probably preempted" by § 301(a) of the Copyright Act, 17 U.S.C. § 301(a) (1988). We have recently held that § 301(a) does not preempt claims for trade secret misappropriation under state law. *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 660 (4th Cir.1993).

**7.** At one point in its opinion, the district court seemed to conflate CTI's trade secrets claim with its copyright claim. The court stated that "the trade secret claims are basically the same as the copyright claims." (J.A. at 65.) For purposes of analysis, however, the district court properly separated the two causes of action.

This separation can sometimes be difficult in the context of computer programs, for the owner of a computer program can often seek protection under both statutory schemes. Computer programs can simultaneously constitute "literary works" under federal copyright law, *see* 17 U.S.C.A. § 102(a)(1) (West Supp.1993), and "processes" or "programs" under state trade secret law, *see* Va.Code Ann. § 59.1–336. Thus, if a person having a confidential relationship with the owner of a copyrighted, trade secret computer program copies the owner's program, the person may both infringe upon the owner's copyright and misappropriate his trade secret. *Cf. Trandes Corp.*, 996 F.2d at 664–65 (copying a trade secret computer program constituted mis-

appropriation). Directly copying the trade secret computer program of another is the most basic form of misappropriation.

It should be noted, however, that a claim for misappropriation of a trade secret does not require the same proof as a claim for copyright infringement. To establish the latter, a plaintiff must prove that the defendant copied its *expression. Dawson*, 905 F.2d at 732. The law of trade secrets, on the other hand, protects *ideas*, without regard for the form of expression. *See* Va.Code Ann. § 59.1–336 (trade secrets include formulas, patterns, compilations, programs, devices, methods, techniques, and processes); *Computer Assocs.*, 982 F.2d at 717 ("trade secret doctrine protects the discovery of ideas"); *Technicon Medical Info. Sys. Corp. v. Green Bay Packaging, Inc.*, 687 F.2d 1032, 1038 (7th Cir.1982) ("trade secret law applies to the contents or ideas in a work"), *cert. denied*, 459 U.S. 1106, 103 S.Ct. 732, 74 L.Ed.2d 955 (1983). Thus, two computer programs may be sufficiently dissimilar on the level of expression to defeat liability for copyright infringement, but they may be sufficiently similar on a more abstract or ideational level to establish liability for trade secret misappropriation. But where, as here, the plaintiff has failed to prove substantial similarities or copying at any level, *see infra*, including the purely ideational level, the plaintiff can establish neither copyright infringement nor trade secret misappropriation.

1984). According to CTI, each of its alleged trade secrets is just such a combination of publicly available information.

In making this argument, CTI misreads the district court's opinion. The district court did not rule that unique combinations or arrangements of publicly available information cannot receive protection as trade secrets. Rather, the district court held that CTI failed to present any evidence that its database organization, its access techniques, and its identifiers were not themselves publicly available. The court specifically found that the arrangement and interaction of the functions of Claims Express and EDI Link were "common to all computer programs of this type." (J.A. at 63.) Information that is generally known cannot qualify as a trade secret. *See* Va.Code Ann. § 59.1–336 (Michie 1992). Consequently, the district court did not misapply the law; it simply found insufficient evidence to support CTI's claim. The district court correctly concluded that CTI failed to prove that the organization, database access techniques, and identifiers of CTI's software constituted trade secrets.

Even if CTI had demonstrated that these items constituted trade secrets, CTI has not convinced us that the district court clearly erred in finding that the Defendants did not misappropriate any of CTI's alleged trade secrets. CTI points to the short development time and the complete lack of design documentation for Transend as strong circumstantial evidence of misappropriation. Although this evidence does raise some suspicions, Defendants provided a colorable explanation for the absence of design documentation. First, Defendant's expert, Dr. Rotenstreich, testified that it was not atypical for small software companies to neglect to prepare extensive design documentation. Second, Sterba testified that he and the others disliked the amount of paperwork involved in documenting their designs, that they preferred to use a "whiteboard" for their design work, and that they placed much of the information that would ordinarily appear in design documentation in the code itself. In light of this testimony, CTI's circumstantial evidence is not enough to convince us that the district court clearly erred in finding that the Defendants did not copy (or "use") any of CTI's alleged trade secret information. *See id.* (wrongful use of a trade secret constitutes misappropriation).

We find instructive the Fifth Circuit's decision in *Plains Cotton Cooperative Ass'n v. Goodpasture Computer Service, Inc.,* 807 F.2d 1256, 1263 (5th Cir.), *cert. denied,* 484 U.S. 821, 108 S.Ct. 80, 98 L.Ed.2d 42 (1987):

> [T]he trade secrets allegedly involved here are particular implementations of software functions.... [T]he misuse of these implementations can occur only through copying the particular software designs on a sufficiently specific level.... [The trade secrets] are matters of design, where *the issue of misuse boils down to evidence of copying.* If no copying occurred on any level, appellant cannot demonstrate that appellees misused the trade secrets they allegedly possessed.
>
>     . . . .
>
> ... If appellees did not in any way "copy" any part of appellant's protected idea or expression, then appellant cannot demonstrate trade secret misappropriation any more than it can show copyright infringement.

(Emphasis added.) As the district court noted, CTI produced insufficient evidence that Transend copied any unique designs or functions of either Claims Express or EDI Link. Without proof of copying at the functional (or ideational) level, CTI has not proved that Defendants "used" and thereby misappropriated any of its trade secret information. The district court correctly concluded that the Defendants did not misappropriate any trade secret information belonging to CTI.

In sum, we conclude that the district court did not misapply the law and that its findings of fact are not clearly erroneous. We affirm the district court's entry of judgment for Defendants on CTI's misappropriation claim.

## IV.

### *Covenant Not to Compete*

CTI next argues that the district court should have enforced Dean Hawkes's

covenant not to compete. In his Termination Agreement, Hawkes agreed that, for a period of twelve months following his departure from CTI, he would not

> engage directly or indirectly in any business within the United States (financially as an investor or lender or as an employee, director, officer, partner, independent contractor, consultant or owner or in any other capacity calling for the rendition of personal services or acts of management, operation or control) which is in competition with the business of CTI. For purposes of this Agreement, the "business of CTI" shall be defined as the design, development, marketing, and sales of CLAIMS EXPRESS) and EDI LINK) type PC-based software with the same functionality and methodology. . . .

(J.A. at 714.) Virginia has established a three-part test for assessing the reasonableness of restrictive employment covenants. Under the test, the court must ask the following questions:

> "(1) Is the restraint, from the standpoint of the employer, reasonable in the sense that it is no greater than is necessary to protect the employer in some legitimate business interest?
>
> (2) From the standpoint of the employee, is the restraint reasonable in the sense that it is not unduly harsh and oppressive in curtailing his legitimate efforts to earn a livelihood?
>
> (3) Is the restraint reasonable from the standpoint of a sound public policy?"

*Blue Ridge Anesthesia & Critical Care, Inc. v. Gidick,* 239 Va. 369, 389 S.E.2d 467, 469 (1990) (citation omitted); *Meissel v. Finley,* 198 Va. 577, 95 S.E.2d 186, 188 (1956). If a covenant not to compete meets each of these standards of reasonableness, it must be enforced. *Roanoke Eng'g Sales Co. v. Rosenbaum,* 223 Va. 548, 290 S.E.2d 882, 884 (1982). As a general rule, however, the Virginia courts do not look favorably upon covenants not to compete, *Grant v. Carotek, Inc.,* 737 F.2d 410, 411 (4th Cir.1984), and will strictly construe them against the employer, *Clinch Valley Physicians, Inc. v. Garcia,* 243 Va. 286, 414 S.E.2d 599, 601 (1992); *Grant,* 737 F.2d at 411. The employer bears the burden of demonstrating that the restraint is reasonable. *Richardson v. Paxton Co.,* 203 Va. 790, 127 S.E.2d 113, 117 (1962).

The district court refused to enforce the covenant not to compete because it concluded that the covenant was broader than necessary to protect CTI's legitimate business interests. First, the court held that the scope of the employment restrictions was too broad because the restrictions precluded Hawkes from working for a competitor in *any* capacity, even as a janitor. The court implied that CTI did not have a legitimate interest in preventing Hawkes from working for a competitor in a menial capacity. Second, the district court concluded that the geographic scope of the agreement was broader than necessary to protect CTI's interests. The court found that CTI had marketed Claims Express only in Virginia, Nebraska, and perhaps one other state, and therefore CTI did not have a legitimate interest in restricting Hawkes's employment throughout the United States. (J.A. at 66–67.)

We review the enforceability of the covenant not to compete *de novo. Brunswick Corp. v. Jones,* 784 F.2d 271, 274 n. 2 (7th Cir.1986).

CTI asserts that under the facts of this case the employment restrictions were reasonably necessary to protect its business interests.

Although the district court believed that the covenant was categorically overbroad because it precluded Hawkes from working for a competitor of CTI in *any* capacity, the Virginia Supreme Court has enforced similarly broad restrictions. In *Roanoke Engineering,* the Court enforced a three-year restriction on an employee's right to "own, manage, operate, control, *be employed by,* participate in, or be associated in any manner with the ownership, management, operation or control of any business similar to the type of business conducted by" the employer. *Roanoke Eng'g,* 290 S.E.2d at 882 (emphasis added). In *Blue Ridge,* the Court upheld a three-year covenant under which the employee could not "open or *be employed by* or act on behalf of any competitor of Employer which renders the same or

similar services as Employer"). *Blue Ridge,* 389 S.E.2d at 468 (emphasis added). The covenant in Hawkes's agreement properly restricts him from competitive employment that would, in all likelihood, substantially interfere with CTI's business. *See Stoneman v. Wilson,* 169 Va. 239, 192 S.E. 816, 819 (1938); *cf. Grant,* 737 F.2d at 412 (covenant which restrained more than direct competition with the employer was unreasonable); *Worrie v. Boze,* 191 Va. 916, 62 S.E.2d 876, 881 (1951) (approving use of covenants to prevent injurious competition).

Moreover, as Vice President of CTI's Software Products Group, Hawkes necessarily came in contact with confidential information concerning both CTI's products and its customers. Hawkes's access to such confidential information makes the covenant not to compete more reasonable. As the Virginia Supreme Court has noted,

> [t]he fact that the employment is of such a character as to inform the employee of business methods and trade secrets which, if brought to the knowledge of a competitor, would prejudice the interests of the employer, tends to give an element of reasonableness to a contract that the employee will not engage in a similar business for a limited time after the termination of his employment, and is always regarded as a strong reason for upholding the contract.

*Stoneman,* 192 S.E. at 819 (internal quotations omitted); *Meissel,* 95 S.E.2d at 191 (possession of trade secrets and confidential information is an "important consideration" in testing the reasonableness of a restrictive covenant); *cf. Community Counselling Serv., Inc. v. Reilly,* 317 F.2d 239, 244 (4th Cir. 1963) (even in absence of covenant not to compete, employee may not appropriate trade secrets and confidential information rightfully belonging to his former employer). Similarly, in *Roanoke Engineering,* an employee had access to confidential financial records, lists of customers and suppliers, and detailed knowledge of overhead factors, pricing policies, and bidding techniques. *Roanoke Eng'g,* 290 S.E.2d at 885. The Virginia Supreme Court held that this information

enabled the employee to become a "formidable competitor" of his former employer, and concluded that a restriction barring the employee from working for competitors in any capacity was no greater than necessary to protect the employer's legitimate business interests. *Id.*

█ Hawkes poses a similar danger to CTI's business. As the individual primarily responsible for the design, development, marketing and sale of CTI's software, Hawkes became intimately familiar with every aspect of CTI's operation, and necessarily acquired information that he could use to compete with CTI in the marketplace.[8] When an employee has access to confidential and trade secret information crucial to the success of the employer's business, the employer has a strong interest in enforcing a covenant not to compete because other legal remedies often prove inadequate. It will often be difficult, if not impossible, to prove that a competing employee has misappropriated trade secret information belonging to his former employer. *Eden Hannon & Co. v. Sumitomo Trust & Banking Co.,* 914 F.2d 556, 561 (4th Cir.1990) (applying Virginia law). On the facts of this case, we conclude that the scope of the employment restrictions is no broader than necessary to protect CTI's legitimate business interests.

█ As a second ground for invalidating the covenant not to compete, the district court concluded that the geographic scope of the employment restrictions—"within the United States"—was greater than necessary to protect CTI's business. (J.A. at 66.) The district court merely noted that CTI had marketed Claims Express in only three states and therefore did not have a national market for its product.

The district court clearly erred in concluding that CTI did not have a national market for Claims Express. *See* Fed.R.Civ.P. 52(a) (findings of fact are reviewed for clear error). CTI licensed Claims Express in at least ten states: California, Colorado, Connecticut, Florida, Iowa, Kansas, Maryland, Nebraska, New York, and Oregon. This list alone dem-

---

8. Hawkes's Employment Agreement specifically acknowledged that in the course of his employ- ment Hawkes would have access to much of CTI's confidential and secret information.

onstrates that CTI's customers were dispersed throughout the country and not concentrated in any particular geographic area. CTI's operation was neither local nor regional, but national. Other evidence of a national market for Claims Express was similarly compelling. Some of CTI's customers were value-added resellers who had agreed to market Claims Express to their own customers. These value-added resellers were located in California (BAS Microtech), Colorado (Dakkro Corporation), Connecticut (Robert Austin), Kansas (Computing Services, Inc., and Resource & Development Services), and Nebraska (The Churchhill Group, LTD). CTI also identified for the district court specific customer prospects in Colorado, Connecticut, Georgia, Illinois, Indiana, Kansas, Maryland, Massachusetts, Minnesota, Missouri, Nebraska, New Hampshire, New Jersey, New York, Oregon, Pennsylvania, Tennessee, Texas, Washington, and the District of Columbia.[9] CTI presented Claims Express and EDI Link (albeit in preliminary form) at national EDIA trade shows in both 1989 and 1990. Finally, CTI presented evidence that it faced direct competition from companies located in California, Colorado, Georgia, Idaho, Illinois, Indiana, Kansas, Maryland, Michigan, Minnesota, New Jersey, Ohio, Oregon, South Carolina, Texas, Utah, and Virginia, and that it faced potential competition from companies in Arizona, California, Georgia, Maryland, North Dakota, Ohio, Oklahoma, Tennessee, and Texas. Given the breadth of the market for Claims Express, we cannot see how anything less than a nationwide prohibition could conceivably protect CTI's business interests. Because CTI had a national market for its product, the restrictions on Hawkes's employment throughout the United States were no greater than necessary to protect it from competition by Hawkes. *See Roanoke Eng'g*, 290 S.E.2d at 885 (restriction geographically coterminous with territory in which employer did business was reasonable); *see also National Homes Corp. v. Lester Indus., Inc.*, 404 F.2d 225, 227 (4th Cir.1968) (under Virginia law, injunctive relief against former employee should be extended to entire state, even though employer had record of sales in only widely scattered sections of the state); *cf. Alston Studios, Inc. v. Lloyd V. Gress & Assocs.*, 492 F.2d 279, 283 (4th Cir.1974) (invalidating restrictive covenant because it did not limit its applicability to appropriate "areas of *possible* competition" (emphasis added)). CTI fully satisfied the first test of reasonableness.

■ Having determined that the covenant not to compete is reasonable from CTI's point of view, we must next determine whether the covenant is reasonable from Hawkes's point of view, i.e., whether the curtailment on Hawkes's ability to earn a living is unduly harsh or oppressive. Although the agreement applies throughout the United States, it restricts Hawkes from engaging in only an extremely narrow category of business. Hawkes may not render personal services to, or perform acts of management, operation, or control for, any business in competition with "the business of CTI," which the agreement defines as "the design, development, marketing and sales of CLAIMS EXPRESSTM and EDI LINKTM type PC–based software with the same functionality and methodology." (J.A. at 714.) The agreement therefore permits Hawkes to design, develop, market and sell any software of a type different from Claims Express or EDI Link, any software of the same type having a different functionality or methodology, or any software of the same type having the same functionality and methodology that is not designed to run on personal computers. Hawkes is also free to compete with any other branch of CTI's business. Because Hawkes retains broad employability under the agreement, the agreement is not unduly harsh or oppressive. *See Blue Ridge*, 389 S.E.2d at 469.

In light of the foregoing, we conclude that the covenant not to compete is no greater than necessary to protect CTI's business and is not unduly harsh or oppressive. Hawkes does not suggest, and we do not find, that the covenant is unreasonable from the standpoint of public policy. We therefore hold that the covenant is enforceable.

**9.** CTI even identified customer prospects in both Ontario, Canada, and the former Yugoslavia.

Because the district court found the covenant unenforceable, it did not reach the question whether Hawkes violated the covenant by participating in the development of Transend. Consequently, we vacate the judgment of the district court for Dean Hawkes on this issue and remand for a determination whether Hawkes has breached his agreement.

### V.

*Bias*

Finally, CTI contends that the district court committed reversible error by expressing "bias" against CTI's software in a footnote to its opinion.[10] CTI speculates that the district court's failure to appreciate the value of computers may have predisposed it to grant judgment against CTI. This argument clearly has no merit.

### VI.

*Conclusion*

In sum, we affirm the judgment of the district court for the Defendants on CTI's claims for copyright infringement and trade secret misappropriation. We vacate the judgment of the district court for Dean Hawkes on CTI's claim for breach of the covenant not to compete and remand for further proceedings.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

MURNAGHAN, Circuit Judge, concurring in part and dissenting in part:

While I fully concur with the majority opinion insofar as it disallows recovery on a copyright or trade secrets basis, I reluctantly come to another conclusion with respect to whether CTI, as employer, could enforce as reasonable and not unduly harsh or oppressive the Hawkes covenant not to compete. The covenant not to compete held valid by the majority is operable "within the United States." The district court found that a reasonable covenant would restrict competition only in "Virginia, Nebraska and perhaps one other state." The majority has enhanced CTI's claim to proof of reasonableness by naming 31 states in which CTI has licenses, clients, or potential clients, but that still leaves 19 others, every one of which, it seems to me, is "within the United States." While the majority characterizes CTI's business as "national," it has provided no justification for calling it all inclusive.

The question of validity or not of the non-compete undertaking is one to be decided by the law of the Commonwealth of Virginia. The decision announced by the majority, that a company with business in only 31 states may enforce a non-compete clause in all 50, is a mathematically dubious one on a Virginia point of law. However, the same decision, if announced by the Virginia Supreme Court, would carry more authority than any decision on the point announced by the Fourth Circuit. *See Commissioner v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967) (applying the rule of *Erie R. Co. v. Tompkins*[1] in a nondiversity case when underlying substantive rule is based on state law because "the State's highest court is the best authority on its own law."). I feel and have suggested that the question should be certified to the Supreme Court of Virginia. Unfortunately, my colleagues on the panel feel otherwise. Hence, I must make as

---

**10.** The district court wrote:

Although not a factor in resolution of the case, it is remarkable that something as simple as a form on which a doctor or hospital submits a claim for reimbursement directly to an insurance company, which could be prepared by an ordinary draftsman in consultation with health care and insurance company personnel, filled out on a word processor by anyone with a tenth grade education at the doctor's or hospital's office, and "faxed" forthwith to the insurance company, can become so complicated when these simple tasks are to be handled, in the interest of "paperlessness," by computer. The time spent on development of the software for this endeavor was enormous and was estimated in terms of "man years." The uninitiated and those not captured by the genius of the computer must wonder whether it is worth the candle. Perhaps the true genius lies with the marketer who successfully persuades the consumer that there is a need for this expensive program so the consumer's operation can become "paperless." (J.A. at 58.)

**1.** 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

educated a guess as possible as to what the Virginia law is.[2]

A restraint on an employee is unreasonable if it is greater than is necessary to protect the employer in its legitimate business interest and unreasonable from the employee's standpoint as unduly harsh in curtailing his legitimate efforts to earn his livelihood. *Richardson v. Paxton Co.*, 203 Va. 790, 795, 127 S.E.2d 113, 117 (1962). "Whatever [the employer's] subjective intent, we must give effect to the language of the agreement, strictly construed." *Linville v. Servisoft of Virginia, Inc.*, 211 Va. 53, 55, 174 S.E.2d 785, 787 (1970).

> Because restraints of trade are disfavored in Virginia, we must give effect to the language of the agreement, strictly construed. See *Linville v. Servisoft of Virginia, Inc.*, 211 Va. 53, 55, 174 S.E.2d 785 (1970); *Richardson v. Paxton Co.*, 203 Va. 790, 127 S.E.2d 113 (1962). We construe the agreement, reading it literally and construing it favorably to the employee, as an attempt to impose a post-employment restraint upon Gress [employee] without geographic or other limitation. We must therefore decline Alston's [employer's] invitation to read into the agreement limitations which simply are not there.

*Alston Studios, Inc. v. Lloyd V. Gress & Associates*, 492 F.2d 279, 285 (4th Cir.1974). "Conceivably the non-competition clause could be interpreted more narrowly, but Virginia law requires that it be strictly construed against the employer...." *Grant v. Carotek, Inc.*, 737 F.2d 410, 412 (4th Cir. 1984).

The Supreme Court of Virginia has never approved a non-compete clause that restricts employment "within the United States." To the contrary, Virginia courts have repeatedly held that non-compete clauses should be limited to a geographic area no greater than is necessary to protect the employer's legitimate business interests. Where Virginia courts have enforced non-compete contracts, the contracts have restricted competition only within "quite narrow and well defined geographic limitations." *Alston Studios*, 492 F.2d at 283 n. 5. *See, e.g., Blue Ridge Anesthesia & Critical Care, Inc. v. Gidick*, 239 Va. 369, 371, 389 S.E.2d 467, 469 (1990) (covenant that prohibited employment only in territories serviced by the former employee, not in the company's entire market area, enforced); *Roanoke Eng'g Sales Co., Inc. v. Rosenbaum*, 223 Va. 548, 552, 290 S.E.2d 882, 884 (1982) (three year restriction that broadly limited an employee's right to be employed by any similar business enforced; court specifically noted that the restriction was reasonable because it was geographically co-terminous with the territory in which the employer did business, which involved only two states); *Meissel v. Finley*, 198 Va. 577, 581, 95 S.E.2d 186, 190 (1956) (covenant with restrictions that applied only within a radius of 50 miles of Norfolk enforced); *Worrie v. Boze*, 191 Va. 916, 922–26, 62 S.E.2d 876, 879–81 (1951) (covenant that restricted competition within 25 miles of dance studio enforced); *Stoneman v. Wilson*, 169 Va. 239, 245, 192 S.E. 816, 818 (1938) (agreement of employee not to go into the hardware business for five years within a limited geographical radius enforced); *Power Distribution, Inc. v. Emergency Power Eng'g*, 569 F.Supp. 54 (E.D.Va.1983) (non-compete contract that restrained former employee from employment with anyone in competition with employer found too broad because area in which plaintiff competed was not fixed and thus the limitation could extend "to every location where plaintiff might *potentially* compete, which included at least the entire United States").

Perhaps the Virginia Supreme Court would agree that the noncompete clause ap-

---

**2.** In that I have the assistance of the district judge, who has had intimate relationship with Virginia law. "As we have noted in the past 'in determining state law in diversity cases where there is no clear precedent,' we accord 'substantial deference to the opinion of a federal district judge because of his familiarity with the state law which must be applied.'" *National Bank of Washington v. Pearson*, 863 F.2d 322, 327 (4th Cir.1988) (quoting *Caspary v. Louisiana Land & Exploration Co.*, 707 F.2d 785, 788 n. 5 (4th Cir.1983)). My panel colleagues hail from South Carolina and West Virginia and I from Maryland. The district judge, acting in the Eastern District of Virginia, refused to enforce the covenant because it was geographically overbroad and unreasonably curtailed the employee's legitimate efforts to earn a living.

plicable to the employee, Hawkes, was reasonable, but in doing so it would have severely to limit, curtail or even contradict what it has said before. I do not accept that we are free to treat a controlling state rule of law applied by the highest court in the Commonwealth of Virginia so cavalierly.

Accordingly, I would hold the non-compete clause overbroad and hence invalid. I would uphold the district court throughout. So to that extent I dissent.