## Staunton

### RAY O. RICHARDSON v. PAXTON COMPANY.

August 31, 1962.

Record No. 5414.

Present, Eggleston, C. J., and Spratley, Buchanan, Snead, l'Anson and Carrico, JJ.

*Henry E. Howell, Jr.* (*Howell, Anninos & Daugherty*, on brief), for the appellant.

*Luther W. White, III* (*Worthington, White & Harper*, on brief), for the appellee.

SNEAD, J., delivered the opinion of the court.

Paxton Company, a Virginia corporation, filed a bill of complaint in which it sought to have Ray O. Richardson enjoined and restrained from "entering or engaging in any branch of marine or industrial supplies, equipment, services business" in the states of Virginia, North Carolina, South Carolina and Maryland for a period of three years from March 31, 1961, the date he terminated his employment with Paxton Company, hereinafter called Paxton. In the alternative, the bill asked that Richardson be restrained from engaging in such businesses for a period of time and in an area the court found to be reasonable for the protection of Paxton's legitimate interests. The relief prayed for was premised upon the restrictive provisions of an employment contract Richardson had entered into with Paxton. After hearing the evidence *ore tenus*, the chancellor awarded the injunction for three years but made it applicable only in the Commonwealth of Virginia.

Paxton Company is engaged in the business of selling marine and industrial supplies, paints, chemicals and services, having its principal office in Norfolk. It has customers in Virginia, North Carolina, Maryland and also a "few" in Delaware and South Carolina. The company's operations consist of several departments, one of which is the chemical and cleaning department.

On April 18, 1957, Ray O. Richardson, who was age 23 and without experience in this particular business, was employed by Paxton as an assistant in the paint section on a "flat salary" basis. By contract dated December 30, 1958, Paxton was appointed distributor for products manufactured by Gamlen Chemical Company "for the territory known as Norfolk, Portsmouth and Newport News". It had formerly been a distributor for Gamlen, but the contract was rescinded by Gamlen several years prior to the new contract. The agreement provided, among other things, that all sales be invoiced by Gamlen. The Gamlen products include solvents, chemical cleaning materials, preservatives, acids etc., which are used to remove scale from boilers and evaporators and as a preservative. Technical skill and "special knowledge" are required of the salesman in order to advise customers of the proper materials to use for a particular job. A wrong application of the products would cause damage to the equipment and the misuse thereof would cause injury to persons working with it as the chemicals are toxic and harmful to the skin.

Paxton placed upon Richardson the "primary responsibility" for

the sale of Gamlen's products. He was sent to a training school held by Gamlen in New Jersey to learn the details of the use of the products. His travel and living expenses there were paid by Gamlen and his salary was paid by Paxton. His duties with Paxton not only required him to sell, but also to appraise jobs, select the chemical and oversee the application of it. He sold products other than those manufactured by Gamlen and assisted in the training of salesmen. Richardson became proficient in his work, intimately acquainted with some of Paxton's customers and their needs for its products, and was a valuable man to Paxton.

In April 1960, Paxton decided it should change the method of compensation for its key employees from a salary to a commission basis and set the terms out in a written contract. William Paxton, president of the company, testified that the decision was made because it would be a "further incentive for them to do a little more than a man does normally on a flat salary." Guy R. Beale, Jr., vice-president and secretary, stated that an additional reason for the contract was because in the past the company had developed certain unknown lines and later had them withdrawn, and that as a "safeguard", the management thought it advisable "to secure these salesmen on a contract" and in return give them adequate compensation. He further stated that Gamlen had previously withdrawn its line from Paxton and had taken one of its key salesmen at that time. A contract of employment was prepared by Beale from some legal forms he had in his office and without the advice and assistance of counsel. William Paxton testified that it was intended to obligate the company to employ Richardson for five years and to obligate Richardson to work for it for the same period of time.

The contract which Richardson executed was dated April 15, 1960, and the pertinent portions thereof follow:

"1. The Salesman [Richardson] agrees to continue in the service of the Company as a salesman of marine and industrial equipment, supplies, services and goods distributed by the Company and of such articles as the Company deems necessary to assist it in the distribution of its products in the States of Virginia, North Carolina, South Carolina and Maryland for a period of five years from May 1, 1960. Both parties reserve the right to cancel this agreement with thirty (30) days written notice in the event of either party's failure to live up to the provisions stated herein.

\*  \*  \*  \*  \*  \*  \*

"8. The Salesman agrees that he will not, directly or indirectly, either as principal, agent, or servant, for the term of three (3) years after any termination of said employment, enter or engage in any branch of marine or industrial supplies, equipment, services business in the territory, without the written consent and approval of said Company."

Paragraph 5 provided a formula for computing compensation on a commission basis, the details of which are not important for a determination of the issues here involved. Suffice it to say that by this method of payment Richardson's compensation increased substantially over the fixed salary he was receiving.

Later George E. Lawson, east coast supervisor for Gamlen, told William Paxton that he thought the company should get more volume of sales in the territory and suggested that Richardson "not be tied up too much" in supervising boiler cleaning so that he could spend more time selling. According to Lawson, Gamlen decided in December, 1960, to withdraw Paxton's franchise, and on March 1, 1961, gave notice in writing, in accordance with the terms of the contract, that it would terminate the contract on May 31. Lawson stated that he made such recommendation to Gamlen, because he did not think the area was being "covered" properly.

In the latter part of February 1961, Richardson met with representatives of Gamlen in New York. There he was told that Paxton's distributorship would be terminated. Later he was offered a position with Gamlen as sales representative for Virginia and North Carolina, which he agreed to accept. Richardson gave notice to Paxton of his intention to resign from his employment effective March 31, by letter dated March 1, which was the same day Gamlen advised Paxton that the distributorship would be withdrawn. He had prior thereto consulted an attorney as to whether his contract with Paxton would prohibit him from accepting the position with Gamlen and he was advised that he was not bound by the contract. Richardson testified that at the time the employment contract was made he thought both parties were bound under it. Upon receipt of Richardson's letter of resignation, Paxton wrote him that it considered paragraph 8 of their contract, *supra*, binding, and that if he violated its provisions, appropriate action would be taken to enforce them.

Richardson assumed his duties with Gamlen on April 1, pursuant to a written contract, and an office and a warehouse were obtained in Norfolk. He testified that neither he nor Gamlen intended to enter the acid cleaning business as conducted by Paxton. Paxton secured

the distributorship of Tricon products, which are comparable to the line sold by Gamlen, and employed a new man to head the department formerly headed by Richardson. On April 6, Paxton filed its bill against Richardson to enforce the restrictive covenants contained in paragraph 8 of their contract, *supra*. By decree of May 12, 1961, the chancellor enjoined and restrained Richardson "from entering or engaging, either directly or indirectly, either as principal, agent, or servant, in any branch of marine or industrial supplies, equipment, services business, within the State of Virginia" for a period of three years after March 31, 1961. The entry of this decree gave rise to this appeal.

In his assignments of error, Richardson alleges that the chancellor erred in decreeing that the negative covenants and restrictions contained in the contract were reasonable and enforceable, and in decreeing injunctive relief.

Richardson argues that the restrictions placed on him were greater than necessary to protect Paxton with respect to the purpose of the employment contract; that they were unnecessarily restrictive of his rights; that Paxton did not prove a case for injunctive relief; that the contract was unenforceable for lack of mutuality, and that the chancellor having concluded that the restrictive covenant as to area was too broad, he should have voided the entire agreement.

Whether restrictive covenants in an employment contract will be enforced in equity depends upon the facts in each particular case. *Meissel* v. *Finley*, 198 Va. 577, 579, 95 S. E. 2d 186; 36 Am. Jur., Restraint of Employee after Termination of Service, § 79, p. 555. In the *Meissel* case we quoted with approval as a guide to decision from *Welcome Wagon* v. *Morris*, 4 Cir., 224 F. 2d 693, 698, wherein the court stated:

"* * * Modern courts have usually, in passing on these contracts, employed three criteria: (1) Is the restraint, from the standpoint of the employer, reasonable in the sense that it is no greater than is necessary to protect the employer in some legitimate business interest? (2) From the standpoint of the employee, is the restraint reasonable in the sense that it is not unduly harsh and oppressive in curtailing his legitimate efforts to earn a livelihood? (3) Is the restraint reasonable from the standpoint of a sound public policy?"

In *Worrie* v. *Boze*, 191 Va. 916, 926, 62 S. E. 2d 876, 881, we said:

"That restrictive covenants of this character which reasonably protect the employer's business and are incident and ancillary to the con-

tract of employment and limited as to area and duration are enforceable in equity is not open to question." * * * Such covenants will be enforced " 'unless found to be contrary to public policy, unnecessary for the employer's protection, or unnecessarily restrictive of the rights of the employees, due regard being had to the subject-matter of the contract and the circumstances and conditions under which it is to be performed.' " See *Meissel* v. *Finley, supra,* 198 Va. at page 580.

For a further discussion of restrictive provisions in an employment contract, see *Arthur Murray Dance Studios* v. *Witter,* 62 Ohio Law Abst. 17, Ohio Com. Pl., 105 N. E. 2d 685, and cases there cited.

In cases of this type the employer has the burden of proving that the restraint is reasonable and the contract is valid. Since the restraint sought to be imposed restricts the employee in the exercise of a gainful occupation, it is a restraint in trade, and it is carefully examined and strictly construed before the covenant will be enforced. Moreover, the scope of permissible restraint is more limited between employer and employee than between seller and buyer, and the covenant is construed favorably to the employee. *Arthur Murray Dance Studios* v. *Witter, supra.*

Here, the restrictive covenant provided that Richardson would not "directly or indirectly, either as principal, agent, or servant, for the term of three (3) years after any termination of said employment, enter or engage in *any branch* of marine or industrial supplies, equipment, services business in the territory * * *". (Emphasis added.) The territory had reference to the states of Virginia, North Carolina, South Carolina and Maryland. The covenant not only restricts Richardson from selling, but prohibits him from entering or engaging in "any branch" of activities relating to any kind or type of marine or industrial supplies, any kind of marine or industrial equipment, and any kind of marine or industrial service in the restricted area. The restraint imposed is too broad and it encompases activities in which Paxton is not engaged. Such restraint is unreasonable in that it is greater than is necessary to protect Paxton in his legitimate business interest, and it is unreasonable from the standpoint of Richardson because it is unduly harsh on him in curtailing his legitimate efforts to earn a livelihood. Thus it cannot be enforced.

Having reached this conclusion, we do not consider it necessary to discuss other questions raised.

For the reasons indicated, the decree appealed from is reversed, the injunction dissolved and the bill dismissed.

*Reversed and dismissed.*