**ROTO–DIE COMPANY, INC., Plaintiff,**

v.

**David LESSER, Defendant.**

**Civ. A. No. 93–0049–D.**

United States District Court,
W.D. Virginia,
Danville Division.

April 17, 1995.

Anthony Paul Giorno, U.S. Attorney's Office, Roanoke, VA, Jane Siobhan Glenn, Fishwick, Jones & Glenn, Roanoke, VA, for plaintiff.

Robert Frank Rider, Rider, Thomas, Cleaveland, Ferris & Eakin, P.C., Roanoke, VA, Michael J. Quinan, Woods, Rogers & Hazlegrove, P.L.C., Roanoke, VA, Anthony H. Monioudis, Woods, Rogers & Hazlegrove, Danville, VA, Joseph Walton Milam, Jr., Woods, Rogers & Hazlegrove, P.L.C., Danville, VA, for defendant.

## MEMORANDUM OPINION

KISER, Chief Judge.

This case is before me on the parties' cross-motions for summary judgment. The case involves the enforceability of a covenant not to compete that the defendant entered into with the plaintiff's predecessor. The parties have fully briefed the issues involved and the Court has heard oral argument. The case is, therefore, ripe for decision. For the reasons below, I will grant the defendant's motion in part and deny the plaintiff's motion.

FACTS:

In 1982, Melvin Stanley and David Lesser incorporated Micrometrics Systems, Inc. ("Micrometrics") as a Virginia corporation. Its principal business was in rotary tooling. On October 14, 1983, in connection with the sale of part of the company to Roto–Die Company, Inc. ("Roto–Die"), Lesser, Stanley and Lesser's wife entered employment agreements with Micrometrics. These agreements contained covenants not to compete. At the time Lesser signed his agreement, he was the secretary and head of marketing and sales. There is some dispute as to whether he was directly involved in any of the technical aspects of Micrometrics.

In February 1987, a notice for a special shareholders' meeting was sent out. The meeting's purpose was to remove Lesser as a member of the board of directors. The cause of the strained relationship is open to some dispute, but the fact that a cloud appeared over Lesser's head in early February 1987 is undisputedly established by the shareholders' meeting notice. On April 28, 1987, Lesser entered into a Termination Agreement. Lesser sold his minority stock interest to Stanley.[1] At this time, Micrometrics and Roto–Die merged other parts of their operation. They were doing business under the trade name "Roto–Metrics Group" and had shared customer lists and sales information. The combination of these two firms captured nearly 40% of the U.S. market during Lesser's tenure.

The Termination Agreement superseded the Employment Agreement, but incorporated the restrictive covenant from the Employment Agreement in paragraph seven. The covenant contains four subparagraphs, all of which are relevant to the discussion below. Paragraph seven forbids the defendant, for a period of five years, from doing the following acts:

(a) Disclose or divulge to any person, entity, firm or company whatsoever, or use for EXECUTIVE'S own benefit or for the benefit of any other person, entity, firm or company, which is directly or indirectly in the trade or business of the manufacture

1. Lesser held no more than a one-third interest in Micrometrics.

or sale of EDM'd or mechanically engraved or milled rotary tooling, any knowledge, information, business methods, techniques, customer lists, price lists, procedures, information relating to the business of the CORPORATION or any other information regarding any of the CORPORATION'S customers or clients or any other firm, company, or entity with whom the CORPORATION has held financial dealings, which information may have been divulged to EXECUTIVE or to which EXECUTIVE may have been exposed during the term of employment by the CORPORATION;

(b) Solicit, divert, take away or interfere with any of the officers, directors, employees, authorized sales representatives, agents or wholesalers of the CORPORATION;

(c) Solicit, canvass, contact, divert, take away or do business with any account, customer, client or company with the intent to sell *or cause to be manufactured* either EDM'd rotary tooling or mechanically milled or engraved rotary tooling; or

(d) Engage in or be associated with any trade or business involved in the manufacture or sale of EDM'd or mechanically engraved or milled rotary tooling (hereinafter referred to as "Competitive Business"). EXECUTIVE shall be deemed as being directly or indirectly engaged in or associated with a Competitive Business if EXECUTIVE becomes a principal, director, officer, *employee,* agent, consultant, partner or individual proprietor of or becomes financially interested in any such business. . . .

(emphasis added). Lesser testified in deposition that he read both agreements, understood them, and had an attorney review them before signing them.

The rotary tooling industry is a fairly small market with only about 3,000 customers and 10–30 manufacturers of rotary dies. All of the manufacturers are in North America or Europe. Growth opportunities exist largely in export markets because the United States' market is reaching saturation. This was particularly true for Roto–Metrics. Lesser recognized the international nature of the business by recruiting Jeff Lane to serve as Chief Executive Officer of Preston Engraver's, Inc., a company Lesser became involved with after leaving Micrometrics. Lane is from the United Kingdom. Another effort by Lesser was the union of Gerhardt Industries, a European manufacturer, with Preston in an alliance to sell products in the United States.

The technology and development of products is closely guarded. Information such as customer lists, exact market share, market size, current technology, technological projects and progress, and plans for market expansion, if disclosed to competitors, would destroy a company's ability to compete. Lesser admits on brief that he came into contact with information that Micrometrics could consider sensitive and worthy of protection.

Lesser's college degree is in chemistry and political science. He has done graduate work in business. Prior to joining Micrometrics, he worked with Webtech, a user of rotary tooling equipment. While at Micrometrics, he was a member of the board, director of marketing and sales, an officer, and a shareholder. His expertise was in selling. Stanley's expertise was in manufacturing.

DISCUSSION:

*Summary Judgment Standard*

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio Co.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In considering a motion for summary judgment, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party. The plaintiff is entitled to have the credibility of all his evidence presumed." *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.) (citations omitted), *cert. denied,* —— U.S. ——, 115

S.Ct. 67, 130 L.Ed.2d 24, *and cert. denied,* — U.S. —, 115 S.Ct. 68, 130 L.Ed.2d 24 (1994). There is a genuine issue of fact "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

*Covenant not to Compete Standard*

 A three-part test determines the validity of restrictive covenants. The inquiries are:

(1) Is the restraint, from the standpoint of the employer, reasonable in the sense that it is no greater than is necessary to protect the employer in some legitimate business interest?

(2) From the standpoint of the employee, is the restraint reasonable in the sense that it is not unduly harsh and oppressive in curtailing his legitimate efforts to earn a livelihood?

(3) Is the restraint reasonable from the standpoint of sound public policy?

*Blue Ridge Anesthesia & Critical Care, Inc. v. Gidick,* 239 Va. 369, 389 S.E.2d 467, 469 (1990). The employer bears the burden of proving the restraint is reasonable. *Grant v. Carotek, Inc.,* 737 F.2d 410, 411 (4th Cir. 1984). The enforceability of a noncompetition agreement is determined in light of the facts of each case. *New River Media Group, Inc. v. Knighton,* 245 Va. 367, 429 S.E.2d 25, 26 (1993).

 Virginia law requires that "non-competition clauses be strictly construed against the employer." *Grant,* 737 F.2d at 411. However, Virginia law recognizes that the law applicable when a sale of a business is involved is somewhat different. *Alston Studios, Inc. v. Lloyd V. Gress & Assocs.,* 492 F.2d 279, 284 (4th Cir.1974). The difference is that the scope of permissible restrictions increases. *Richardson v. Paxton,* 203 Va. 790, 127 S.E.2d 113, 117 (1962).

In the present case, both the 1983 Employment Agreement and the 1987 Termination Agreement were executed in connection with larger transactions. In 1983, the Employment Agreements were obtained as part of a sale of a portion of the company to Roto–Die. In 1987, the parties entered into the Termination Agreement as part of the sale of Lesser's interest in the company to Stanley. However, the 1987 transaction, and the resulting restrictive covenant directly in issue here, involved the sale of Lesser's *minority* position in the company under questionable circumstances. In similar cases, courts have held the minority shareholder to be in no better bargaining position than a mere employee. *See S. Hammond Story Agency, Inc. v. Baer,* 202 Ga.App. 281, 414 S.E.2d 287, 288 (1991). Accordingly, I will treat this case as equivalent to a case involving an employer and employee.[2]

*Estoppel*

 Plaintiff argues that Lesser is estopped from denying the validity of the covenant not to compete. It rests this argument upon paragraph 6 of the Termination Agreement and paragraph 7(d) of the Employment Agreement (subsequently incorporated into the Termination Agreement). In paragraph 6, Lesser purportedly waives and is estopped from asserting that the restrictive covenant is illegal or unenforceable. Paragraph 7(d) states that Lesser's employment would "constitute knowledge that the restrictions contained [in the restrictive covenant] are reasonable and necessary ... to protect the ... legitimate business interest" of the plaintiff.

Plaintiff's argument is not well-taken. To adopt plaintiff's argument would allow employers to insulate their noncompete agreements from review, simply by including a stock phrase or clause that says either the employee cannot challenge it or that the employee recognizes the importance of the employer's interest. Virginia law clearly looks with disfavor upon restraints of trade. *Grant,* 737 F.2d at 411.[3] Employers may not circumvent this public policy merely by in-

---

**2.** The standard discussed in the preceding three paragraphs, however, does not necessarily apply to non-disclosure and non-solicitation agreements, as will be discussed later in the opinion.

**3.** Virginia law is also sensitive to the respective bargaining positions of the parties. *See Foti v. Cook,* 220 Va. 800, 263 S.E.2d 430, 433 (1980).

cluding boilerplate language in their employment agreements.[4]

*Reasonableness of Covenant*

 Lesser presents two main arguments that the covenant in paragraph 7(d) is unreasonable. First, he argues that its scope is overly broad in the types of activities prohibited. Second, he argues that the covenant, which does not contain a specific geographic limitation, applies world-wide. A world-wide covenant is unreasonable. For both of these reasons, Lesser argues, the first part of the three-part test is unsatisfied. Lesser also argues that the covenant violates public policy as a result of its overly broad, *in terrorem* effect. While no specific attack is made under the second part of Virginia's test, it is clear that if the covenant is overly broad in scope or geography, then it is unreasonable from the employee's standpoint as well as the employer's.

 Turning first to the issue of overly broad scope of activities, I believe that Lesser's argument is well-taken. Lesser focuses upon the language in paragraph 7(d) that prohibits him from being an "employee" of any "Competitive Business." Strictly construed against the employer, which means in this context to give the broadest possible meaning to the language, this provision would prevent Lesser from working in any capacity, including that of a janitor, for a "Competitive Business." Lesser relies principally upon *Richardson, Grant,* and *Power Distribution, Inc. v. Emergency Power Engineering, Inc.,* 569 F.Supp. 54 (E.D.Va.1983) (Merhige, J.).

I agree with Lesser that the covenant not to compete is void on its face. The provision contains no functional limitation as to Lesser's work with another employer. Thus, construed strictly against the employer, it could be read to prohibit any type of employment, even employment outside the scope of the work Lesser did for Micrometrics. It is true

that Virginia cases have upheld covenants that extend to "any employment" with a competitor. For example, in *Rosenbaum,* the court upheld the following language: "Employee will not ... directly or indirectly, own, manage, operate, control, *be employed by,* participate in, or be associated in any manner with the ownership, management, operation or control of any business similar to the type of business conducted by [employer]...." *Rosenbaum,* 290 S.E.2d at 883 (emphasis added). Likewise, in *Blue Ridge* the covenant provided that: "Employee ... will not ... open or *be employed by* or act on behalf of any competitor of Employer which renders the same or similar services as Employer...." *Blue Ridge,* 389 S.E.2d at 468 (emphasis added). The covenant allowed the employee to work in the medical industry in a noncompetitive role. *Id.*[5]

On the other hand, the lack of a restriction to businesses that may compete with the employer was the reason the *Richardson* court struck down the covenant in question there. *See Rosenbaum,* 290 S.E.2d at 885 & n. 3. That is the failing of this covenant. Admittedly, it contains reference to "Competitive Businesses." But the term as used in the covenant is merely a descriptive term, a short-hand reference for the more lengthy "any trade or business involved in the manufacture or sale of EDM'd or mechanically engraved or milled rotary tooling...." This provision does not bespeak actual competition between Micrometrics or Roto–Die and any competitor. *See Grant,* 737 F.2d at 412 (lack of restriction to actual competition rendered covenant unenforceable); *Sunstates Refrigerated Servs., Inc. v. Griffin,* 215 Ga. App. 61, 449 S.E.2d 858, 860 (1994) (descriptive term "competing business" insufficiently restrictive of post-employment activities to sustain covenant not to compete). Accordingly, I believe the covenant contained in paragraph 7(d) is more like those held unenforceable in *Richardson* and *Grant.*

---

4. Plaintiff's resort to Lesser's answer is also unavailing. In paragraph 11 of Lesser's answer, Lesser merely admits that the Termination Agreement and/or Employment Agreement contained language regarding the need for the restrictive covenant.

5. Although neither party cited the case, *Comprehensive Technologies Int'l, Inc. v. Software Artisans, Inc.,* 3 F.3d 730, 738 (4th Cir.), *vacated and app. dismissed,* Sept. 30, 1993, involved a very similar situation. However, given the subsequent history of the case, it is not binding authority within the circuit.

Paragraph 7(c) of the covenant presents a closer issue. It seems broader in its potential application, preventing the employee from "doing business with" a company with the "intent to sell or cause to be manufactured" EDM'd rotary tooling or mechanically milled or engraved rotary tooling.[6] This clause could be saved given the proper reading. Unlike the descriptive term "Competitive Business," that contained no functional limitation, paragraph 7(c) applies to "any account, customer, client or company." This wording indicates an intent to limit the restriction to present business relationships.

I would be inclined to uphold paragraph 7(c) were it not for the troublesome phrase "or cause to be manufactured." The only logical way I can see to address this phrase is to say that it pertains to two different executives: Lesser, the salesman, and Stanley, the engineer. Under this interpretation, as to Lesser, the clause would read: Executive will not solicit any customers with intent to sell EDM'd rotary tooling, etc. As to Stanley, the clause would read: Executive will not cause to be manufactured any EDM'd rotary tooling, etc. Thus, the clause would be narrow enough for Lesser because it is limited to present customers of plaintiff, but it may be too broad as to Stanley because it would cover geographical areas where plaintiff is not doing business.

The issue, then, is whether the subparagraph may remain effective as to defendant, even if it was too broad as to Stanley? I conclude that it may not and, thus, will hold paragraph 7(c) unenforceable. While the reading proposed above is possible, the very fact that the mental gymnastics required to reach it had to be performed indicates why it must fail. As Judge Merhige astutely observed in *Power Distribution*: "Thus, the Court need not determine the exact reach of the covenant in order to conclude it is overbroad. The fact that its reach is so difficult to determine and may so easily exceed in effect the permissible reach renders the cov-

enant overbroad." 569 F.Supp. at 58. The mere act of subjecting the employee to the uncertainty of an ambiguous provision offends public policy. *Id.*

This leads to the issue of geographical scope. The defendant's position is well-taken. Neither paragraph 7(c) or 7(d) contain any geographical limit, only a time limit of five years. Without an apparent limit in the language of the covenants themselves, I can only conclude that the covenants are meant to be world-wide in scope. *See Alston Studios*, 492 F.2d at 283 (covenant did not contain geographic limit and, thus, could prohibit employment anywhere in the world).

Plaintiff seems to concede this point, but argues that world-wide protection is required. Viewed in the light most favorable to plaintiff, the evidence establishes that there are few suppliers of rotary tooling equipment in the world. The evidence also establishes that manufacturers must turn to export markets in order to fuel continued growth.[7] Indeed, Lesser was involved in the push towards international expansion. However, the undisputed evidence reveals that plaintiff's sales overseas, while increasing, remain a small percentage of total sales. Furthermore, Stanley testified that there have been sales only in Canada, the United Kingdom, Germany, Austria, and Switzerland. There is also evidence of sales activity in unspecified countries in Latin America. As to another group of countries, China, the former Soviet Union, and Africa, Stanley testified he was unsure of the extent of activity in those areas. In some of the countries, there could be no activity. There is no other evidence in the record regarding any other countries.

I believe the plaintiff has failed in its burden to come forward with evidence on which a reasonable finder of fact could determine that it is entitled to world-wide protection. There are certainly a lot more countries in the world than the few that Stanley has named. Likewise, the overall percentage of

---

6. Because the term "do business with" could apply to working for another company, I apply the standards developed for covenants not to compete to paragraph 7(c).

7. Defendant has challenged the admissibility of the Ron Spring affidavit because Mr. Spring was not identified on interrogatories. I need not decide this issue because the evidence contained in the affidavit does not alter the result I reach.

international sales is not very impressive. Indeed, given Stanley's testimony of the strength of presence in Canada and Europe, most of the international sales are probably in those countries. At most, plaintiff might be able to claim protection for European countries other than those specifically mentioned. But that excludes a large number of markets, including much of three continents—Asia, Africa and South America (to the extent not included in the term "Latin America"). An employer's mere hope that it may *potentially* compete in a given market is insufficient. *Power Distribution,* 569 F.Supp. at 57. *See Alston Studios,* 492 F.2d at 283 (invalidating covenant not to compete where it contained no language limiting the restriction to areas of possible competition).[8]

### Public Policy

As noted above, merely subjecting the employee to an ambiguous restrictive covenant violates public policy. *See Power Distribution,* 569 F.Supp. at 58. Thus, paragraphs 7(c) and 7(d) fail for that reason as well.

### Severability

The plaintiff has argued in supplemental briefing that the Court should analyze the four subparts of the restrictive covenant independently. Plaintiff reasons that the separate subparts protect different interests. Even if one may be invalid, the others should still be enforced. I agree and, therefore, hold that paragraphs 7(a) and 7(b) are valid and enforceable.

Paragraphs 7(a) and 7(b) clearly address different concerns than paragraphs 7(c) and 7(d). Paragraph 7(a) protects from disclosure of confidential information while paragraph 7(b) prohibits solicitation of plaintiff's employees.[9] Certainly, Virginia law recognizes the importance of protecting confiden-

tial information. The legislature deems it important enough to write trade secrets protection into the Virginia code. Va.Code Ann. § 59.1–336 to –343 (Michie 1992). Courts have also recognized the importance of protecting confidential information, even to the extent it may not qualify as a trade secret under the statute. Customer contacts are an example of an interest in which a business has a legitimate need to protect. *Eden Hannon & Co v. Sumitomo Trust & Banking Co.,* 914 F.2d 556, 562 (4th Cir.1990), *cert. denied,* 499 U.S. 947, 111 S.Ct. 1414, 113 L.Ed.2d 467 (1991).

Courts outside Virginia decline to hold an entire agreement invalid when the agreement contains an invalid covenant not to compete. "The mere fact that a noncompete covenant is void does not render void the remainder of the employment contract." *Zep Mfg. Co. v. Harthcock,* 824 S.W.2d 654, 662 (Tex.Ct.App.1992); *see also Hi–Line Elec. Co. v. Dowco Elec. Prods.,* 765 F.2d 1359, 1363 n. 5 (5th Cir.1985). Instead, the invalid provision may be severed from the contract and the valid provision enforced if the intent of the parties is not thereby frustrated. *Zep,* 824 S.W.2d at 662. Other courts adopt a similar view of the difference between a noncompete and a nondisclosure agreement. *Howard Schultz & Assocs. of the Southeast, Inc. v. Broniec,* 239 Ga. 181, 236 S.E.2d 265, 269–70 (1977); *Durham v. Stand–By Labor of Ga., Inc.,* 230 Ga. 558, 198 S.E.2d 145, 149 (1973) ("[A] claim for breach of covenant not to compete and one for wrongful disclosure and use of confidential information in violation of contract may be maintained separately and independently under the same or distinct provisions of the employment agreement."); *Cafe Assocs., Ltd. v. Gerngross,* 305 S.C. 6, 406 S.E.2d 162, 165 (1991). The contract in this case contains provisions that are connected with "or", indi-

---

8. *Cf. Comprehensive Technologies,* 3 F.3d at 740 (upholding covenant not to compete with nationwide geographic scope because employer had a national market for its goods). Judge Murnaghan dissented in *Comprehensive Technologies* on the ground that the Virginia Supreme Court had never upheld a covenant that was so geographically broad. *Id.* at 742 (citing cases). He emphasized the importance of respecting the decisions of the Virginia Supreme Court as to what

Virginia law means. *Id.* at 743. *See supra* note 5 (discussing subsequent history of *Comprehensive Technologies* ).

9. While paragraph 7(c) appears on its face to prohibit solicitation of customers, as noted above, construed strictly against the employer it could also prohibit employment and, thus, is analyzed under the standard advanced earlier.

cating independent obligations. Moreover, while there is no severability provision in the Termination Agreement, that agreement incorporates the following savings clause:

It is the CORPORATION'S intention to restrict EXECUTIVE'S activities only to the extent necessary for the protection of the legitimate business interests of the CORPORATION, and both the CORPORATION and EXECUTIVE specifically agree that should any of the provisions set forth in this Agreement under any set of circumstances not now foreseen by either the CORPORATION or EXECUTIVE shall be deemed too broad for that purpose, said provisions will nevertheless be valid and enforceable to the extent necessary for such protection.

This clause indicates the parties intent to preserve portions of the covenant should other portions be voided.[10]

Defendant's reliance on *Eden Hannon* is misplaced. The Fourth Circuit in *Eden Hannon* did not apply the modified *Blue Ridge* factors to the nondisclosure portion of the agreement. The district court had already analyzed that portion of the agreement and found that there had been no disclosure of trade secrets and thus no violation of the nondisclosure provision. *Eden Hannon*, 914 F.2d at 562. Instead, the court of appeals was concerned with the noncircumvention agreement, which in that context was tantamount to a covenant not to compete. *Id.* at 563. In fact, the Fourth Circuit's discussion in *Eden Hannon* illustrates the difference between a nondisclosure provision and a noncompete provision. Simply put, the latter is just an easier way to enforce the former. *See id.* at 561–62. The difference in purpose is further indication of the necessity for different treatment.

*Blue Pencil Power*

■ While I believe paragraphs 7(a) and 7(b) are severable from paragraphs 7(c) and 7(d), I decline to adopt the so-called "blue pencil" rule. There is no Virginia case directly on point. Lesser points to various passages in cases that suggest the power does not exist under Virginia law. I believe the better view is that the power does not exist. As the Fourth Circuit in *Alston Studios* made clear: " 'We think the restrictive covenant must be judged as a whole and must stand or fall when so judged.' " 492 F.2d at 284 (quoting *Welcome Wagon v. Morris*, 224 F.2d 693, 701 (4th Cir.1974)). Virginia's rule of strict construction against the employer, based upon the words used in the contract, is also indicative of a refusal to adopt the "blue pencil" rule. *See Clinch Valley Physicians v. Garcia*, 243 Va. 286, 414 S.E.2d 599, 601 (1992). Accordingly, I decline the invitation to create a new contract for the parties.

The difference between "blue pencilling" and severing is a matter of focus. The former emphasizes deleting, and in some jurisdictions adding, words in a particular clause. The latter emphasizes construing independent clauses independently. As the Georgia line of cases illustrate, the two propositions are not inconsistent. *See Howard Schultz*, 236 S.E.2d at 269; *Sunstates Refrigerated Servs., Inc. v. Griffin*, 215 Ga.App. 61, 449 S.E.2d 858, 860 (1994) (Georgia's rejection of the "blue pencil" theory does not require invalidating provisions in same agreement concerning nondisclosure, return of documents, and interference with employee's contractual relationships).

*Conclusion*

Based upon the forgoing, I grant in part the defendant's motion for summary judgment and deny the plaintiff's motion for summary judgment. The covenant has at least two defective provisions, paragraphs 7(c) and 7(d), which fail due to ambiguous construction and excessive geographic scope. However, paragraphs 7(a) and 7(b) are seemingly valid. As the parties have not raised the issue, I do not decide whether, or under what circumstances, paragraphs 7(a) and 7(b) could be deemed invalid. *See Sunstates*, 449

10. This savings provision should be contrasted with that held ineffective in the "estoppel" discussion, *supra*. The plaintiff's estoppel argument attempted to preclude the defendant from attacking the restrictive covenants altogether. The savings clause purports to have no such wide-ranging effect.

S.E.2d at 860 (adopting two-part standard for application to nondisclosure agreements).