## CIRCUIT COURT OF THE CITY OF NEWPORT NEWS

Elwood A. Pais, Jr.

v.

Automation Products, Inc.

April 17, 1995

Case No. (Chancery) 25273-RF

BY JUDGE ROBERT P. FRANK

In September of 1993, Elwood A. Pais filed a Motion for Declaratory Judgment against Automation Products, Inc., t/a API Business Furniture, ("API") asserting that the restrictive covenants contained in the Employment Agreement were invalid and unenforceable because (1) API had generally released and covenanted not to sue upon them; (2) the covenants as a matter of law were overbroad and unreasonable; and (3) the covenants could not properly be invoked by non-renewal of employment but instead required termination. Mr. Pais presently seeks summary judgment on these same issues.

In March of 1994, API filed a Bill of Complaint against Mr. Pais requesting injunctive relief for breach of the restrictive covenants contained in the Employment Agreement. In addition, API seeks liquidated damages of $50,000.00 under Paragraph 5 of the Employment Agreement. Third, the Bill of Complaint alleges breaches of both common law and fiduciary duties by Mr. Pais. Lastly, API asserts a breach of the Trade Secrets Act by the willful and malicious misappropriation of trade secrets.

### I. *Parol Evidence*

At the time of the hearing, this Court reserved ruling on the underlying issue of parol evidence as it pertained to the Separation Agreement. Counsel for API argued that such evidence was admissible under the partial integration and mutual mistake exceptions to the parol evidence rule. Mr.

Pais, however, contends that the Separation Agreement is complete on its face, and thus, parol testimony is inadmissible.

The parol evidence rule states that "extrinsic evidence will be excluded when offered to add to, subtract from, vary, or contradict the terms of a written contract." *High Knob, Inc. v. Allen*, 205 Va. 503, 506 (1964). Phrased another way, "evidence of prior or contemporaneous oral negotiations is generally inadmissible to alter, contradict, or explain the terms of a written instrument provided the document is complete, unambiguous, and unconditional." *Renner Plumbing, Heating & Air Conditioning v. Renner*, 225 Va. 508, 516 (1983). Therefore, "when the parties set out the terms of their agreement in a clear and explicit writing, the document is the sole memorial of the contract and the sole evidence of the agreement." *Id.*

There are, however, several well-recognized exceptions to the parol evidence rule. The doctrine of partial integration, for example, provides that "where the entire agreement has not been reduced to writing, parol evidence is admissible, not to contradict or vary its terms but to show additional independent facts contemporaneously agreed upon, in order to establish the entire contract between the parties." *Renner Plumbing* at 515-16. Another exception, which arises on proof of the mutual mistake of the parties, states that "equity should give effect to the true intent of the parties, despite a contrary intent reflected by a writing the parties mistakenly believed to monument their bargain." *Gibbs v. Price*, 207 Va. 448, 449-50 (1966).

While API asserts that the parol evidence is admissible under the doctrines of partial integration and mutual mistake, it does not contend that the Separation Agreement is unambiguous or incomplete on its face. Rather, API relies on the testimony of Mr. Barry as well as the numerous drafts of the Separation Agreement to demonstrate that the agreement was neither reduced completely to writing nor reflective of the parties' true intentions. According to API's parol evidence, the parties agreed that the Separation Agreement neither confirmed nor refuted the existence of the non-compete clause in the Employment Agreement and that the parties would be left to litigate that issue another day.

In order for the partial integration doctrine to apply, however, the writing must be incomplete or unambiguous on its face, without assistance from the parol evidence. The law is clear that a court may not, where the contract language is clear, invite or accept the submission of extrinsic evidence, find ambiguity in the contractual text based upon that evidence,

and then resolve the found ambiguity by resorting to that same extrinsic evidence. *Amos v. Coffey*, 228 Va. 88, 93, (1984). Therefore, when the writing "upon its face is without any uncertainty as to the object or extent of the engagement, it is conclusively presumed that the whole engagement of the parties and the extent and manner of their undertaking was reduced to writing." *Adams v. Seymour*, 191 Va. 372, 383 (1950).

Here, the Separation Agreement is plain, complete, and unambiguous on its face such that parol evidence is inadmissible under the partial integration doctrine. Paragraph 8B of the Separation Agreement clearly states that API:

> releases, covenants not to sue, and holds harmless Pais, his heirs and assigns, of and from all manner of action and actions, caused and causes of action, suits, debts, sums of money, accounts, covenants, contracts, agreements, promises, damages, claims, and demands of every kind or character whatsoever, whether presently known or unknown, suspected or unsuspected, under state or federal laws, which API now has against Pais, his heirs, and assigns.

This provision by Mr. Barry's own admission is a mirror image of Paragraph 8A which is intended as a general release of liability for API as against its employees. The language is clear and certain, and therefore, the parol evidence is inadmissible.

Furthermore, it should be noted that API's parol evidence is not admissible under the partial integration doctrine for it attempts to alter the terms of the Separation Agreement. The partial integration doctrine is available "not to contradict or vary [the] terms [of the agreement] but to show additional independent facts contemporaneously agreed upon." *Renner* at 516. Thus, API may not admit evidence to show that the release was intended to exclude the noncompete covenants because such testimony directly conflicts with the language of the agreement.

API also asserts that parol evidence is admissible to show mistake, namely that the parties intended the release to be prospective only and not to address the Employment Agreement. The defense of mistake, however, only applies to errors of fact and not law. In addition, in order for parol evidence to be admissible to demonstrate mistake, the mistake must be common to both contracting parties; "parol evidence is never competent to show merely what one of the parties thought." *Fox-Sadler Co. v. Norris Roofing Co.*, 229 Va. 106, 110 (1985).

In the present case, the only error claimed by API is that the release was intended to be prospective and not to address the Employment Agreement. Thus, the parties allegedly misunderstood the legal consequences and not some underlying factual presumption. As a result, relief will not be granted because the parties, operating with knowledge of all material facts, entered into the agreement only under a mutual mistake of law. *Piedmont Trust Bank v. Aetna Cas. & Sur. Co.*, 210 Va. 396, 401 (1969).

Second, the evidence only shows mistake on the part of API in its drafting. While Mr. Barry may have erred because "I was not thinking in terms of the noncompete survivability" and "I did not focus on the specific individual terms," (Transcript pp. 51-2), the evidence is clear that Mr. Pais did not make the same mistake. In fact, Mr. Barry's testimony itself shows that Mr. Pais specifically and intentionally requested the addition of paragraph 8B such that the release would be reciprocal. (Transcript p. 51.)

Further, it was Mr. Pais' understanding, from his conversations with Mr. Barry, that Mr. McDevitt did not intend to pursue the covenants. (Transcript p. 138.) While Mr. Pais admitted he "would have felt better if it specifically said something" regarding the noncompete clauses, he nonetheless testified that he "felt quite comfortable that paragraph eight covered everything." (Transcript p. 138.)

For these reasons, API has failed to establish mutual mistake of law such that it would be entitled to the assistance of parol evidence to interpret the contract.

## II. *Analysis of the Release*

Having found the contractual terms to be clear and unambiguous, it is the duty of the court to enforce them. *Winn v. Aleda Constr. Co.*, 227 Va. 304 (1984). Thus, this Court must now determine whether the terms of the Separation Agreement serve as a general release and covenant not to sue such that the noncompete clauses of the Employment Agreement are discharged.

In interpreting the language of a contract, the general rules of construction require that the words be given their plain meaning; the court is not free to rewrite a contract to express "an intention that is otherwise indiscernible." *Amos v. Coffey*, 228 Va. 88, 93 (1984).

Paragraph 8B of the Separation Agreement plainly states that API "releases, covenants not to sue, and holds harmless Pais . . . of and from all . . . covenants, contracts, agreements, promises . . . whether presently known or unknown . . . which API now has against Pais." The words of

Paragraph 8B clearly grant a general release to Mr. Pais from all covenants then existing, including the covenant not to compete as contained in the Employment Agreement; no other rational interpretation or understanding can be derived from this language. And "even if this may not have been what [API] intended when it drafted this provision, we are limited to the language of the contract, strictly construed." *Clinch Valley Physicians, Inc. v. Garcia*, 243 Va. 286, 290 (1992).

For this reason, this Court finds that as a matter of law Paragraph 8B of the Separation Agreement releases Mr. Pais from all covenants and agreements which existed *prior* to the Separation Agreement, including the covenants not to compete contained in the Employment Agreement. It should be noted, however, that Paragraph 8B in no way releases Mr. Pais from any obligations or causes of actions which may have accrued *subsequent* to the Separation Agreement.

### III. *Analysis of the Covenants*

Even disregarding the paragraph 8B release, the covenants not to compete as contained in the Employment Agreement are invalid and unenforceable by reason of overbreadth and unreasonableness. The relevant provisions state:

5. During the term of his employment, Employee covenants that he will not engage in competition with the Company in the business of Company or a *similar or related type of business*, nor will he in any manner become interested in, directly or indirectly, as an owner, partner (dormant or otherwise), agent, stockholder, director, or officer of a corporation or otherwise, any business in competition with Company or any similar or related type business within the *economic marketing* area of Company defined in the following paragraph number 6 [emphasis added].

Employee further covenants that for the period of two (2) years after the date of the termination of his employment with Automation for any reason, he will in no event in competition with Automation solicit (directly or indirectly) accept, *handle in anyway, do business with*, or cause a change in the relationship between the Company and *any person, firm, association, or corporation*, including but not specifically limited to the customers, suppliers, and manufacturers *who had any business relationship with Company*, within two years of the date of termination of the

Employee's employment. It is specifically understood that Employee is prohibited for the said two-year period from soliciting, accepting, handling, or in any way doing business with anyone or *any entity that has been a customer or identified as a prospective customer* of Company during the two years preceding termination [emphasis added].

Employee further covenants that for the aforementioned period of two (2) years from the date of the termination of his employment and within the aforesaid *economic marketing areas* of Automation, he will not engage in competition with Automation in business as an employee, employer, owner, partner (dormant or otherwise), agent, stockholder, director, or officer of a corporation or otherwise, with any of the present or future, full or part time employees of the business furniture and office supplies business or a similar or related business, nor will Employee in any way, directly or indirectly, cause any of the aforementioned present or future, full or part-time employees of Automation to terminate his or her employment with Automation during the said two (2) year period [emphasis added] . . . .

6. For the purposes of this Employment Agreement, the economic marketing area of the Company shall be defined as that area within a one hundred twenty-five mile radius of each and every Company office or employee location, wherever situated in which Company, Company's subsidiary, or Company's franchisee, whether in its principle name and capacity or under the terms of a Company subsidiary, Company franchise, or similar arrangement.

In *Richardson v. Paxton Company*, 203 Va. 790, 127 S.E.2d 113 (1962), the Supreme Court of Virginia applied the following criteria when analyzing restrictive covenants:

(1) Is the restraint, from the standpoint of the employer, reasonable in the sense that it is no greater than is necessary to protect the employer in some legitimate business interest?

(2) From the standpoint of the employee, is the restraint reasonable in the sense that it is not unduly harsh and oppressive in curtailing his legitimate efforts to earn a livelihood?

(3) Is the restraint reasonable from the standpoint of a sound public policy?

In determining the reasonableness of a restrictive covenant, the Supreme Court of Virginia has consistently focused on the duration (not presently disputed), territory, and activities restricted. Specifically, the Court has given particular attention to the relationship of the parties. *Meissel v. Finley*, 198 Va. 577 (1956).

In construing a covenant not to compete, the burden of proof lies with the employer. *Linville v. Servisoft of Va., Inc.*, 211 Va. 53 (1970). Similarly, where a covenant not to compete contains vague terms or ambiguities, the courts will construe the language strictly against the employer. *Richardson v. Paxton Co.*, 203 Va. 790, 127 S.E.2d 113 (1962); *Linville v. Servisoft of Va., Inc.*, 211 Va. 53, 174 S.E.2d 785 (1970); *Alston Studios, Inc. v. Lloyd V. Gress & Assocs.*, 492 F.2d 279 (4th Cir. 1974).

The testimony establishes that API is a dealer in office furniture for government offices; the company essentially serves as a broker which assists in purchasing and provides installation services for government offices. The vast majority of API's business, upwards of ninety percent according to Mr. Pais, involves the sale of a product with a price fixed on the GSA award schedules. (Transcript pp. 8-12.) These prices are published nationally, and under a GSA contract, the price may not vary. (Transcript p. 7.)

The only variable in pricing a GSA contract involves the installation and design charges. According to Mr. Pais, over 50% of API's business involves some form of installation which is basically the only negotiable element in the contract. (Transcript p. 12.) This fee for installation, or, in other words, the profit margin, is almost always a "percentage of the net" and is continually adjusted by API on a monthly basis. (Transcript pp. 12, 22.)

Mr. Pais served as API's executive vice-president for approximately five years. As such, he knew the margin goal and established the parameters for the salesmen; and if a salesman wanted to go below a certain margin, Mr. Pais would make the final determination. (Transcript pp. 16-18.) In addition, Mr. Pais was responsible for the everyday management and growth of API such that he was fully informed of all API's pricing fees and data. (Transcript pp. 78-80.)

Nonetheless, Mr. Pais insisted that this information is by no means confidential or unique to API as it is available from the public record. Once an award has been made, the bids become public information and anyone making a request can receive a copy; from there, "it is then a very simple mathematical equation to get the installation." (Transcript pp. 22-

24.) In fact, Mr. Pais testified that his company would make such requests in order to double-check their bids and to calculate the profit margin of their competitors. (Transcript pp. 22-24.) Mr. Pais testified that he knew for a fact, based on this research, that the profit margin of API's largest competitor is 14-16%. (Transcript p. 23.)

As an officer of API, Mr. Pais was also very familiar with API's customer base. The majority of the business was located on the Southside, or here on the Peninsula. (Transcript p. 117.) Beyond that there were no direct sales by the sales force north of the line running from Newport News to Richmond, southwest to Fort Pickett near Blackstone, Virginia. (Transcript p. 118.) Any sales beyond that boundary were to prospective customers through API's catalogue. (Transcript p. 118.)

Mr. Pais testified that this customer information is not unique to API, however, because anyone can identify the purchasing agent at the military installations. (Transcript p. 19.) He testified that "it's easy to know the purchasing agent who buys furniture . . . because all you have to do is go to a military base and ask who is the purchasing agent that buys furniture. It's the same at every base." (Transcript p. 19.)

Mr. Pais did admit that, as a result of this constancy, he could move away from the area without giving up much of an edge. (Transcript p. 20.) Yet due to Mr. Pais' personal and family circumstances, he is unable to make such a move presently. In addition, he is unable to make a career change given the fact that he is in his late forties, has been in the business over twenty years, and knows no other activity. (Transcript pp. 123-24.)

Mr. McDevitt, API's President, also testified regarding the customer and pricing information which his company maintains is highly confidential and privileged. (Transcript pp. 80-85.) However, this testimony did not truly conflict with Mr. Pais, for on cross-examination, Mr. McDevitt admitted that the price of the bid, including the negotiable factor of installation, was available upon a proper request to the government. (Transcript pp. 93-95.) In addition, Mr. McDevitt acknowledged that there are national publications which list the various military associations throughout the country and which could be used to identify prospective customers.

In addition, Mr. McDevitt testified as to how he selected the 125 mile geographical limit. It was his opinion that it reflected "a fair limit on the service area that we can handle." (Transcript p. 86.) However, he admitted that the company has clients far beyond that boundary, including one in Arizona. (Transcript p. 95.) API reaches these governmental installations

through mass mailings of over 18,000 catalogues to "prospective customers" throughout the country. (Transcript pp. 95-97.)

Clearly, API has a legitimate interest in preventing Mr. Pais from soliciting its customers or directly competing against it. Yet the restriction must be no greater than is necessary for its protection.

Geographically, the non-compete restriction would prohibit Mr. Pais from, at a minimum, competing within 125 miles of an API office or the work place of an API employee so that Mr. Pais is prohibited from sales as far north as Maryland. At a maximum, the restrictive covenants under subparagraphs 2 and 4 of Paragraph 5 could conceivably extend throughout the world.

The evidence is, however, that API had minimal sales outside of the lower half of the 125 mile radius. (Transcript p. 133.) In addition, sales outside Virginia made up less than 5% of API's sales. (Transcript p. 133.)

While the Supreme Court, in *Blue Ridge Anesthesia v. Gidick*, 239 Va. 369 (1990), has upheld a broad-ranging restriction that included four states and the District of Columbia, the restriction at issue only applied to territories serviced by the former employee, not Blue Ridge's entire market area. In *Paramount Termite Control v. Rector*, 238 Va. 171 (1989), the Supreme Court similarly upheld a geographic restriction which was limited to counties in the state in which the employee was assigned. Again, the restriction did not apply to areas in which the employee did not work.

The geographic restriction in this instant case is broader than necessary to protect API's legitimate business interests. The 125 mile restriction is not related to Mr. Pais' former activities, but it covers API's entire market area of "potential customers" which conceivably ranges nationwide.

In addition, the covenants are unreasonable as to the relationships and activities which Mr. Pais may establish. As highlighted above, subparagraph 2 of Paragraph 5 prohibits Mr. Pais from dealing with *anyone* with whom API has had any dealings, regardless of whether the business involved office furnishings or supplies. In addition, the covenants totally prohibit Mr. Pais from dealing with any business regardless of whether the business concerned office furniture. Thus, Mr. Pais is prohibited not only from buying his cleaning supplies from the same business as API, but also from catering an office party for API's customers.

Clearly, under these restrictions, Mr. Pais could not pursue a livelihood selling business furnishings while simultaneously remaining in the Peninsula/Tidewater Virginia area. The enforcement of this covenant would force the defendant to choose between a new career or a substantial

relocation. Either option would severely curtail the defendant's legitimate efforts to earn a living.

In summary, the restrictive covenants are overly broad and unreasonable both as to the geography and activities encompassed. Public policy would not encourage covenants that would effectively prevent a person from pursuing his livelihood or from requiring the person to move great distances to relocate. Thus, this Court holds, apart from its other findings, that the noncompete covenants are unenforceable as drafted. As generally this Court has not been granted the authority to "blue-pencil" or otherwise rewrite the contract, the covenants therefore fail.

### IV. Trade Secrets and Confidential Information

In its Bill of Complaint, API claims that Mr. Pais has disclosed trade secrets and confidential information in violation of his contractual, common law, and statutory duties. In addition, API seeks an injunction based on any and all of the foregoing grounds.

In support of its breach of contract claim, API relies on subparagraph 4 of Paragraph 5 of the Employment Agreement which reads as follows:

> Employee further covenants that he will not divulge for a period of two (2) years to any person, corporation, or other entity any of the accounts, transactions, expansion or contraction plans, or any other secrets or privileged information of Automation. For any violation of this provision, Employee would agree to pay the sum of Fifty Thousand Dollars ($50,000.00) to be deemed liquidated damages, in addition to any other actual damages which Company sustains as a result of the breach hereof.

API asserts that Mr. Pais has violated this provision by disclosing to The Work Place, Inc., Mr. Pais' company, secrets and privileged information of API, including cost and price data, as well as key employees and contacts of API's customers.

Each of these claims, for violation of contractual, common law, and statutory duties, however, is also governed by the Release in Paragraph 8B. As discussed above, API agreed to release, covenant not to sue, and hold harmless Pais from all covenants, contracts, agreements, and promises then existing.

Clearly, API's contractual claim for $50,000.00 in liquidated damages necessarily fails under the terms of this general release. This liquidated damages provision concerns a covenant by Mr. Pais which was in exist-

ence prior to the execution of the Separation Agreement. Therefore, it is encompassed within the terms of the release and is not binding upon Mr. Pais.

With regard to the claim for misappropriation under the Trade Secrets Act, the release carries the same implications. In analyzing a cause of action under the Trade Secrets Act, the plaintiff must prove that the information was (1) a trade secret and (2) misappropriated. Without even addressing the agreements as to whether the information was a trade secret for purposes of the statute, it is clear that there could be no misappropriation.

Under the Trade Secrets Act, Virginia Code § 59.1-336, "Misappropriation" is defined as:

> 1. Acquisition of a trade secret by another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
> 2. Disclosure or use of a trade secret of another without express *or implied consent.* [Emphasis added.]

In the testimony, there was no suggestion that Pais acquired his knowledge or information by improper means; in fact, he was given the information as a result of his Vice-Presidential sales status. Thus, part one of the test for misappropriation cannot be satisfied. The only issue then is whether Pais' disclosure or use of any information was "without express or implied consent."

When API and Pais first entered into their relationship, it was clear that API was concerned with what it considered to be confidential information and trade secrets. The prefaces to the Employment Agreement state:

> Whereas, Automation has engaged in the sales of business furniture and office supplies and has developed a very valuable business and good will and, in addition, has developed and is developing as major assets of the business (1) lists of present and prospective customers; (2) certain work methods and techniques; and (3) certain new products and new product ideas; and
>
> Whereas, Employee is being hired for the position of Vice President-Sales with responsibility for all of Automation's sales accounts and, as such, will devote his efforts to the sales of Company products and services to customers, to the development of existing and new sales accounts, to the training and

development of sales personnel, and to such other services as are delegated to him by Automation; and . . . .

Whereas, in the course of such employment, Employee will have access to such confidential information concerning customers, prospects, sources of supplies, work methods and techniques, new product and product ideas, and other important confidential knowledge relating to the business and the background of the business of Automation as would result in irreparable injury to Company not adequately compensable in money damages if Employee should enter into the employment of or become interested in a competitive concern or otherwise compete with Automation in its business.

The Employment Agreement then continues, after establishing the basic terms of employment, by outlining in great detail the covenants not to compete and other prohibitions on competition which have been previously discussed.

When the Separation Agreement, including the general release, was signed however, API entirely abandoned those covenants, agreements, and rights, thus leading not only Pais but anyone else to believe that API had no intention of attempting to enforce its prior contractual agreements regarding competition. In other words, API not only expressly but also impliedly waived its previous contractual rights and consented to business competition from Pais.

Therefore, API cannot now be heard to claim that Pais misappropriated any business information or knowledge gained during his employment with API. If API had intended to enforce the covenants not to compete or any other prohibition on competition, it never should have granted Pais a general release in the Separation Agreement.

Lastly, with regard to API's claims of breach of fiduciary duty, API has failed to identify any specific duty owed by Pais. In fact, as API's brief points out, the Supreme Court of Virginia, in *Peace v. Conway*, 246 Va. 278, 281 (1993), has adopted part of the Restatement (Second) of Agency which states that "unless otherwise agreed, after termination of the agency, the Agent: (a) has no duty not to compete with the principle." While the agent may be limited from using confidential information or trade secrets as similarly codified in § 59.1-336, he is nonetheless "entitled to use general information concerning the methods of business of the principle and the names of the customers retained in his memory."

Accordingly, there is no fiduciary duty distinct from those of the Trade Secrets Act, and thus, API has no cause of action on this ground. Assuming, however, that such a duty could be identified, the same analysis applied with regard to the Trade Secrets Act claim would be applicable. Where API has clearly released Pais from all "covenants, contracts, agreements [and] promises" not to compete or use information and knowledge acquired during his employment with API, it cannot now claim damages and seek an injunction against the same behavior.

In summary, the Court finds that the various covenants and agreements made by Pais in the Employment Agreement were released by the terms of the Separation Agreement. Further, even had they not been released, the covenants not to compete are invalid as they are both unreasonable and overbroad. Finally, for the reasons discussed above, API's motion for a preliminary injunction is denied.