*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 14-CV-1427 & 15-CV-1203

FILED 02/1/2018
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

YEHUDA STEINER, ET AL., APPELLANTS,

v.

AMERICAN FRIENDS OF LUBAVITCH (CHABAD), ET AL., APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(CAB-6353-14)

(Hon. John M. Campbell, Trial Judge)

(Argued October 27, 2016                    Decided February 1, 2018)

*Nicolle Kownacki*, with whom *Kathryn J. Mims* and *Chauncey A. Bratt* were on the brief, for appellants.

*Andrew M. Grossman*, with whom *Paul M. Levine* was on the brief, for appellees.

Before BECKWITH and EASTERLY, *Associate Judges*, and FARRELL, *Senior Judge*.

BECKWITH, *Associate Judge*: This case raises the question whether a noncompete and noninterference clause in a religious minister's employment contract may be enforced by a preliminary injunction after the employment is

terminated. Appellant Rabbi Yehuda Steiner was hired by American Friends of Lubavitch (AFL), a nonprofit affiliated with "the Chabad-Lubavitch movement," to run AFL's campus outreach at George Washington University (GW). The noncompete and noninterference clauses at issue in this case appear in an employment contract Rabbi Steiner signed—on behalf of himself and his wife, Rivky Steiner—with one of the organization's representatives, appellee Rabbi Levi Shemtov. When the Steiners' employment ended under contested circumstances, Rabbi Shemtov and appellee AFL filed a complaint alleging a breach of contract and successfully sought a preliminary injunction that required the Steiners to refrain from competing or interfering with AFL's involvement at GW. A subsequently amended version of that injunction is now the subject of this appeal.

The Steiners challenge the injunction on five separate grounds, arguing that the trial court lacked subject-matter jurisdiction, that it abused its discretion by issuing the injunction, that it erred in applying the doctrine of equitable reformation to the noncompete clause, that the injunction violated the Free Exercise Clause of the First Amendment and the Religious Freedom Restoration Act, and that Rabbi Steiner's wife, Rivky Steiner, was not a party to the contract and was therefore improperly enjoined.

We conclude that the trial court had subject matter jurisdiction to issue the

injunction. We also formally adopt the doctrine of equitable reformation to modify contract provisions, but hold that the trial court's equitable revision of the noncompete clause in this case exceeded the bounds of that doctrine by describing the activities the Steiners were precluded from engaging in using broader language than the terms of the employment contract itself and thus effectively expanding the scope of the restrictions contained in the noncompete clause. We therefore vacate the injunction and remand for a determination of what, if any, provisions of the modified preliminary injunction remain enforceable, consistent with this opinion. We also remand for a determination as to whether Rivky Steiner could be properly enjoined, should any provisions remain enforceable.

## I. Background

The appellants, Rabbi Yehuda Steiner and his wife Rivky Steiner, belong to Chabad-Lubavitch, an Orthodox Jewish movement centered in Brooklyn, New York. They moved to the District of Columbia in 2008 when Rabbi Steiner was hired by American Friends of Lubavitch—a nonprofit that describes itself as "the Chabad-Lubavitch movement's mandated representative entity in Washington"— to be a campus rabbi at George Washington University. Within a year, Rabbi Steiner's relationship with Rabbi Levi Shemtov, the head of AFL's Washington office, deteriorated, and in November 2011, Rabbi Shemtov purported to fire

Rabbi Steiner. Rabbi Steiner challenged the termination before a rabbinical court and won, after which he and Rabbi Shemtov entered into a new employment contract.

The new contract stated that Rabbi Shemtov had "ultimate rabbinic and executive authority over Chabad-Lubavitch activities in Washington, DC—governmental, communal and local, including the universities" and indicated that he was employing Rabbi and Rivky Steiner in that capacity. Rabbi Steiner's responsibilities under the contract included organizing Friday night Shabbos dinners, classes, social events, and annual trips to Israel "to enable Jewish students to interact with each other as much as possible[.]"

The contract included a noncompete clause stating that if the Steiners were terminated, they would not "enter into employment or arrangement—of whatever scope or duration—with any Chabad-Lubavitch entity or any other institution, performing similar work, anywhere in DC, or suburban MD or VA." This noncompete clause was followed by a noninterference clause stating that, after the end of the employment, the Steiners agreed "to conclude their operations at GWU peacefully within 30 days of notification" and to do so "without causing any damage or discomfort" to Rabbi Shemtov or AFL and without "interfering with any arrangement or subsequent decision made by [Rabbi Shemtov] in connection

with GW or any other activities over which [Rabbi Shemtov] has authority." The contract concluded with a statement that the parties agreed to the specified terms and conditions "in conformance with the laws of, under the jurisdiction of, and enforceable in the District of Columbia." Rabbi Steiner signed the contract on behalf of himself and his wife, and Rabbi Shemtov signed it on behalf of himself, his wife, and AFL.

The parties performed pursuant to the terms of the contract for two years, until the relationship between Rabbi Steiner and Rabbi Shemtov broke down again, and Rabbi Shemtov for the second time fired Rabbi Steiner. While contesting the termination before religious and civil courts, Rabbi Steiner continued his religious outreach activities at GW, including his use of the "Chabad @ GW" name and of property belonging to AFL. He later switched to using the name "Jewish Colonials" or "Jewish GW."

AFL and Rabbi Shemtov brought this breach of contract action and simultaneously moved for a preliminary injunction ordering the Steiners to "cease their operations at GWU immediately," not perform similar work "at, around, or related to GWU," and cease using the Chabad name and Chabad property. In response, the Steiners asserted several affirmative defenses and counterclaims and sought a declaratory judgment that the noncompete clause was unenforceable.

The trial court granted a preliminary injunction, but applied the doctrine of equitable reformation to narrow the scope of the restrictions, noting that AFL and Rabbi Shemtov "d[id] not seriously dispute" that the noncompete clause was "an overbroad and thus unenforceable restraint on trade."

The resulting order required the Steiners to cease their operations at GW and stop using "ChabadGW" branding, return property and a leased "Chabad Lounge" to the plaintiffs, and refrain for two years from conducting any of the activities the Steiners were hired to do, as directly specified in their employment contract, within one mile of the GW campus. The trial court found that two years was "a reasonable period of time necessary to enable the plaintiffs to regain control of the Chabad program at GW without unreasonable interference and competition from defendants," and that the activities that the Steiners were to organize with GW students as laid out in the contract were the "core of what the plaintiffs bargained for."

The trial court found that AFL and Rabbi Shemtov had clearly demonstrated all four prerequisites of a preliminary injunction. AFL and Rabbi Shemtov were likely to succeed on the merits, the court found, because the Steiners were "clearly not in compliance with the noncompete clause of the contract . . . whether as written or as equitably revised." AFL and Rabbi Shemtov had likewise

demonstrated that they would suffer irreparable harm without the injunction, that they would suffer greater harm from the denial of the injunction than the Steiners would, and that the injunction would be consistent with the public interest because the "short-term . . . disruption for a handful of students"[1] was less of a concern than the "strong public interest in the enforcement of contracts."

The Steiners appealed and asked this court to stay the preliminary injunction. This court held oral argument on the stay request and then issued an order—instructing the trial court to clarify the scope of the injunction and to explain how the injunction was "compatible with the requirements of the First Amendment." After further briefing from both parties, the trial court ruled that the preliminary injunction had no constitutional or statutory infirmities. The court nonetheless modified the injunction to reflect the parties' understanding that the prohibition on organizing the types of programs normally associated with Rabbi Steiner's religious duties under his contract with AFL—such as Shabbos dinners, classes, and social events for Jewish students—only applied to activities with GW students near the GW campus. The court also adjusted and widened the geographic area around the GW campus to which the injunction applied and

---

[1] The Steiners proffered a petition signed by 118 GW students attesting to the special personal relationship they shared with their religious mentor, Rabbi Steiner.

attached a corresponding new map.

The Steiners filed an appeal from this modified injunction order, which was consolidated with the earlier appeal. Before this court the Steiners now challenge the injunction on various grounds, ranging from this court's jurisdiction over the matter to the overall validity and constitutionality of the injunction.

## II. Subject Matter Jurisdiction

The Steiners contend on appeal that this case falls outside the secular jurisdiction of the District of Columbia courts because "resolution of this religious dispute" and enforcement of the modified injunction "would require the Superior Court to decide matters of ecclesiastical cognizance and impermissibly entangle itself with religious concerns." We apply a de novo standard of review to the trial court's contrary conclusion, "as the issue of subject matter jurisdiction is a question of law." *Meshel v. Ohev Sholom Talmud Torah*, 869 A.2d 343, 353 (D.C. 2005) (citations omitted).

The two "religion clauses" of the First Amendment, the Free Exercise Clause and the Establishment Clause, together "severely circumscribe the role that civil courts may play in the resolution of disputes involving religious organizations." *Meshel*, 869 A.2d at 353. This principle, as a rule of constitutional

law, dates back to a pair of Supreme Court cases that held that "matter[s] of ecclesiastical government," such as the selection of clergy or the decision of which sect speaks for a church, could not be determined by the government, whether through legislative action, *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94, 115 (1952), or judicial order, *Kreshik v. St. Nicholas Cathedral*, 363 U.S. 190, 191 (1960). *See generally Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 445–49 (1969).

The rule that emerged from this line of cases, sometimes referred to as constitutional immunity, *see United Methodist Church, Baltimore Annual Conference v. White*, 571 A.2d 790, 793 (D.C. 1990), or religious abstention, *see Family Fed'n for World Peace v. Hyun Jin Moon*, 129 A.3d 234, 248 (D.C. 2015), states that the First Amendment prevents civil courts "from adjudicating church fights that require extensive inquiry into matters of 'ecclesiastical cognizance.'" *Bible Way Church of Our Lord Jesus Christ of Apostolic Faith of Washington, D.C. v. Beards*, 680 A.2d 419, 427 (D.C. 1996) (quoting *Burgess v. Rock Creek Baptist Church*, 734 F. Supp. 30, 31 (D.D.C. 1990)). As we have recognized, however, "[n]ot every civil court decision . . . jeopardizes values protected by the First Amendment." *Heard v. Johnson*, 810 A.2d 871, 879 (D.C. 2002) (quoting *Presbyterian Church in U.S.*, 393 U.S. at 449). "Religious organizations come

before [the courts] in the same attitude as other voluntary associations for benevolent or charitable purposes, and their rights of property, or of contract, are equally under the protection of the law . . . ." *Family Fed'n for World Peace*, 129 A.3d at 248 (quoting *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 714, 20 L.Ed. 666 (1871)).

"The touchstone for determining whether civil courts have jurisdiction is whether the courts may employ 'neutral principles of law' and ensure that their decisions are not premised on the 'consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith.'" *Family Fed'n for World Peace*, 129 A.3d at 249 (quoting *Second Episcopal Dist. African Methodist Episcopal Church v. Prioleau*, 49 A.3d 812, 816 (D.C. 2012)). "[T]he 'neutral principles' approach avoids prohibited entanglement in questions of religious doctrine, polity, and practice by relying 'exclusively upon objective, well-established concepts' of law that are familiar to lawyers and judges." *Meshel*, 869 A.2d at 354 (quoting *Jones v. Wolf*, 443 U.S. 595, 603 (1979)). "[I]n determining whether the adjudication of an action would require a civil court to stray impermissibly into ecclesiastical matters, we look not at the label placed on the action but at the actual issues the court has been asked to decide." *Id.* at 356.

The Steiners first argue that enforcement of an injunction that precludes

them from engaging in certain ministerial and religious outreach activities with students who had previously been their congregants would require the court to make difficult and constitutionally questionable findings while policing the border between prohibited and allowed conduct.

In this case, the injunction sought by the appellees and issued by the trial court bars the Steiners as parties to an agreement from engaging in certain outreach activities with a population—GW students—who had previously been their congregants. The relevant provision of the injunction in this case is one that the trial court imposed by equitably reforming the language of the noncompete clause to prohibit the Steiners from doing those activities set out in the employment contract that they were hired to perform. To enforce this injunction, the court does not need to determine what religious activities are required of the Steiners by Chabad religious doctrine. The court need only determine what religious activities the Steiners contracted to perform for appellees, which are set forth in a contract "agreed to in conformance with the laws of" the District of Columbia.[2]

---

[2] The Steiners were free to enter into a contract obligating them to curtail the scope of their religious expression in exchange for the opportunity to lead the community at GW under the employ of AFL. *See Minker v. Balt. Annual Conference of United Methodist Church*, 894 F.2d 1354, 1359 (D.C. Cir. 1990) ("A church is always free to burden its activities voluntarily through contracts, and such contracts are fully enforceable in civil court."). Whether the terms of the

(continued…)

The Steiners attempt to frame this case as one requiring the court to hold that the First Amendment bars civil courts from interfering with internal church matters by, for example, determining who rightfully controls a religious institution or its property, *see, e.g.*, *Samuel v. Lakew*, 116 A.3d 1252 (D.C. 2015), or settling disputes over ministerial employment and termination, *see, e.g.*, *Natal v. Christian & Missionary All.*, 878 F.2d 1575, 1576 (1st Cir. 1989); *Minker*, 894 F.2d at 1356–57. In such cases, judicial interference may threaten "the autonomy of religious entities 'to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" *Family Fed'n for World Peace*, 129 A.3d at 248 (quoting *Hosanna–Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 186 (2012)).

---

(…continued)

injunction impose an unconstitutional or impermissible burden on their religious exercise, however, is a question about the validity of the burden imposed, rather than an inquiry bearing on subject matter jurisdiction. *See, e.g.*, *Avitzur v. Avitzur*, 446 N.E.2d 136, 138 (N.Y. 1983) (enforcing specific performance of an agreement to appear before a religious tribunal because the dispute over the agreement required only "the application of objective well-established principles of secular law" rather than a departure into the religious substance of the rest of the agreement). Even taking the Steiners' religious beliefs at face value, the task before the court at the outset remains interpreting which activities the injunction bars. Although we ultimately hold *infra* in Part III.B.1. that the court erred by impermissibly expanding the noncompete clause in equitably reforming it, it bears repeating that the error is one of contract interpretation, not jurisdictional overreach. The trial court, in equitably reforming the noncompete clause, issued an injunction that in the court's determination represented the agreement arrived at between the parties to the employment contract. The court did so through the application of neutral principles of contract law.

In *Bible Way*, for example, we held that the civil courts lacked subject matter jurisdiction where the former church employee brought a negligent accounting claim against the religious organization. 680 A.2d at 424, 428–31. The complaint did not allege "indisputable, universally applicable rules of accounting and financial reporting," and because accounting "is an area riddled with major subjective decisions," the complaint accordingly required the court to "select and impose [accounting standards] on a church board of trustees[.]" *Id.* at 428–29. We could not do so without delving into "ecclesiastical judgment." *Id.* at 429. But we clarified that, where a religious organization adopted a set of accounting principles that would have permitted the court to apply clear, objective criteria "without implicating church doctrine," civil courts would have jurisdiction over the dispute. *Id.* at 428.

In other words, where a case does not involve any inquiry into the internal affairs, hierarchy, or autonomy of a religious organization, but rather involves a dispute that may be resolved on "neutral principles of law," the court may exercise jurisdiction. *Jones v. Wolf*, 443 U.S. at 603. Our decision in *Meshel* was one such case. There, a provision in the corporate bylaws of an Orthodox Jewish congregation known as Ohev Sholom, which was organized under District of Columbia law, "provide[d] that any claim of a member against the congregation that [could not] be amicably resolved shall be referred to a 'Beth Din' of Orthodox

Jewish rabbis for a binding decision according to Jewish law." 869 A.2d at 346. Congregation members, upset that the board of directors for Ohev Sholom had, in their eyes, "perpetrated a succession of improper acts [under the bylaws] that had damaged the congregation and fundamentally altered its governing structure," brought suit, seeking to compel the Ohev Sholom to submit to binding arbitration before a Beth Din, as prescribed by the bylaws. *Id.* at 352–53.

We held that the civil courts had subject matter jurisdiction to resolve the dispute. *Id.* at 346. Because the congregation and its members had already decided on a dispute resolution mechanism through the congregation's bylaws—a corporate document adopted pursuant to District of Columbia law—the court had only to "apply, without ecclesiastical judgment or intrusion, a previously prescribed, authoritative, non-discretionary" policy. *Id.* at 356 (quoting *Bible Way*, 680 A.2d at 428). The action to compel turned not on ecclesiastical interpretation, but on contract interpretation. *Id.* at 357. Thus, we held that, just as with the rules of statutory construction, the "formation, interpretation, and enforcement of contracts" are "objective, well-established, 'neutral principles of law' that civil courts may apply, consistently with the First Amendment, in resolving disputes involving religious organizations." *Id.* at 355 (citing *Williams v. Bd. of Trs. of Mt.*

*Jezreel Baptist Church*, 589 A.2d 901, 908 (D.C. 1991)).[3]

In the case before us, the Steiners entered into a contractual agreement with appellees, and performed on that contract for years before the agreement dissolved. The parties do not ask the court to determine the boundaries of Chabad, or to look to internal policies or principles of religious law to resolve this dispute. The parties ask this court to review the language of a noncompete clause in a contract, entered into in conformance with the laws of the District of Columbia, and to enforce a preliminary injunction drafted from the language in their agreement. Contract interpretation and the enforcement of preliminary injunctions are two tasks that civil courts are equipped to handle by relying "'exclusively upon objective, well-established concepts' of law that are familiar to lawyers and judges." *Meshel*, 869 A.2d at 354 (quoting *Jones v. Wolf*, 443 U.S at 603).

"Under the objective law of contracts," courts look first to the plain meaning of the document, and where the proper interpretation of the agreement "cannot be

---

[3] Moreover, we were not persuaded by the argument that the dispute would impermissibly entangle the court in ecclesiastical matters because the court might have to interpret religious terms such as "Beth Din," "Din Torah," or "Orthodox rabbis." *Id*. at 354. Rather, there was "no material dispute between parties over the meaning of any of these terms," and it was "apparent from the record" that the parties understood what those terms meant. *Id.* at 354–55. The court's adjudication did not require interpreting religious terms so much as looking to the conduct and understanding of the parties. *Id.*

derived from the contractual language exclusively," courts look also to the course of performance under the contract. *Sahrapour v. LesRon, LLC*, 119 A.3d 704, 716 (D.C. 2015) (citing Restatement (Second) of Contracts § 203 (1981)); *cf. Family Fed'n for World Peace*, 129 A.3d at 252 ("Neutral principles of law can govern the establishment of an agency relationship, and it may be that an examination of the structure and long-standing practices of the Church will provide an answer to the actual existence of such a relationship.").

Here, neither the noncompete as originally drafted nor the clause as reformed in the trial court's modified preliminary injunction contains terms that would require religious interpretation and therefore preclude a civil court's review of this dispute. Years of performance on the contract demonstrate that the parties well understood the meaning of organizing "Shabbos" dinners and "shiurim" for students. And to the extent that the description of any other campus activity for which the Steiners were responsible is ambiguous, the court could look to that performance for guidance to appropriately enforce the injunction. In short, because the parties set forth their agreement in a contract at the outset of performance, the court need not delve into matters of ecclesiastical import to

resolve this dispute, and is therefore not divested of subject matter jurisdiction. [4]

The Steiners further argue, however, that the court lacks subject matter jurisdiction because adjudicating the case would require the court to determine whether Rabbi Shemtov has "ultimate rabbinic authority" in Washington, D.C. More specifically, the Steiners argue that two of Rabbi Steiner's affirmative defenses turn on whether he possessed the religious authority that he claimed: fraud in the inducement and the doctrine of mutual mistake. [5] Appellees in turn argue that the Steiners have waived this issue, that they should be estopped from raising the issue because they elsewhere seek relief under the contract, and that this

---

[4] We note, however, as we have in the past, "that going forward, if it becomes apparent to the trial court that this dispute does in fact turn on matters of doctrinal interpretation or church governance, the trial court may" grant relief to the Steiners "to avoid 'excessive entanglement with religion.'" *Prioleau*, 49 A.3d at 818 (quoting *Minker*, 894 F.2d at 1360).

[5] The Steiners also argue that Rabbi Steiner lacked "capacity" to enter into a contract, because whether he has "ultimate rabbinic and executive authority over Chabad-Lubavitch activities" in the District is in dispute. Although it is true that "[a] contract is void or voidable if one of the parties lacked the capacity to enter into it," *District of Columbia v. Brookstowne Cmty. Dev. Co.*, 987 A.2d 442, 446 (D.C. 2010), legal "capacity" stands for "whether the person in question possesses sufficient mind to understand, in a reasonable manner, the nature, extent, character, and effect of the particular transaction in which [he] is engaged[.]" *Butler v. Harrison*, 578 A.2d 1098, 1100 (D.C. 1990); *see also Hernandez v. Banks*, 65 A.3d 59, 74 (D.C. 2013) (en banc) (holding that a contract was voidable where entered into by a mentally incapacitated party). The law honors valid employment contracts regardless of whether the contract is made by a person in his capacity as a leader of a religious denomination or otherwise.

issue has already been resolved by a binding arbitration.

The trial court dismissed this argument on the ground that it was not an issue for the court to resolve at the preliminary injunction stage—noting that the parties had at "many times in the record acknowledged Rabbi Shemtov's authority." We agree.

Both the doctrine of mutual mistake and fraud in the inducement are grounds for rescission and may be used as a defense to a breach of contract suit. *See In re Estate of McKenney*, 953 A.2d 336, 342 (D.C. 2008). On mutual mistake, "[w]here a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake[.]" Restatement (Second) of Contracts § 152 (1981); *see also Rotunda v. Marriott Int'l, Inc.*, 123 A.3d 980, 984 n.4 (D.C. 2015) (adopting and applying the Restatement). On fraud in the inducement, "[i]f a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient." Restatement (Second) of Contracts § 164 (1981); *see also King v. Indus. Bank of Wash.*, 474 A.2d 151, 155 (D.C. 1984) ("Misrepresentation by one party to a contract will not relieve the other party

of his contractual obligation unless he relied on the misrepresentation and was induced by it to enter into the contract.").

To prevail on either defense, then, the Steiners must establish not only the falsity of Rabbi Shemtov's claim to "ultimate rabbinic authority," but also demonstrate that it was a "basic assumption on which the contract was made" and that it had a "material effect on the agreed exchange of performances," or that the Steiners justifiably relied on the statement to the extent that it induced them to enter into the contract. The trial court was equipped to assess these challenges to the contract's validity. Accordingly, we hold that on the facts of this case, the religion clauses of the First Amendment do not divest the civil courts of subject matter jurisdiction to implement and enforce an injunction.

### III. The Trial Court's Revision of the Restrictive Covenant

The Steiners raise a variety of arguments challenging the validity of the revised injunction, as well as the propriety of its issuance. At the outset, the Steiners argue that the trial court erred by applying the doctrine of equitable reformation to the overbroad noncompete clause, rather than revising the clause by application of the "blue-pencil rule." Moreover, the Steiners argue that, regardless of which doctrine should apply to judicial modifications of contracts in the District of Columbia, the court erred by impermissibly broadening the scope of the

restrictive covenant and by engaging in equitable reformation at all where the original terms were overbroad.

### A. The Doctrine of Equitable Reformation

The Steiners suggest that this court's precedent supports the adoption of the so-called "blue-pencil doctrine" should a court decide to modify an overbroad noncompete clause. Appellees counter that the trial court did not err by instead applying the doctrine of equitable reformation, pointing to the doctrine's trending popularity in other jurisdictions and its flexibility for allowing more reasonable revisions.

Most courts take one of three approaches to restrictive covenants containing unenforceable provisions. One approach is simply to refuse to enforce an overbroad covenant. *See, e.g.*, *CAE Vanguard, Inc. v. Newman*, 518 N.W.2d 652, 655–56 (Neb. 1994); *Rollins Protective Serv. Co. v. Palermo*, 287 S.E.2d 546, 549 (Ga. 1982) (in the employment context); *Rector–Phillips–Morse, Inc. v. Vroman*, 489 S.W.2d 1, 5 (Ark. 1973). This court has already "rejected the view that covenants not to compete must be enforceable in whole or not at all." *Ellis v. James V. Hurson Assocs., Inc.*, 565 A.2d 615, 617 (D.C. 1989).

We have never expressly adopted or rejected either of the remaining two

approaches: the "blue-pencil" rule, which allows courts only to sever overbroad terms "where the severable character of the restriction is evident from the terms of the agreement," or the approach that is sometimes called the equitable reformation doctrine, which allows courts to enforce a covenant "to the extent that its terms are reasonable, regardless of grammatical severability." *Id.* at 617–18 ("[W]e need not in this preliminary injunction appeal decide whether or not to adopt a 'blue pencil' rule in this jurisdiction").

Under the blue-pencil doctrine, the court has discretion to cross out overbroad, unreasonable provisions in a noncompete clause while keeping in place the enforceable language. *See Compass Bank v. Hartley*, 430 F. Supp. 2d 973, 980 (D. Ariz. 2006). This approach does not allow the court to redraft terms or add language to the clause, even where the revision would narrow the scope of the covenant. Instead, the court is limited to deleting unreasonable terms or provisions to narrow the scope and enforcing the remaining language, so long as the language remains grammatically coherent. Maryland courts appear to favor this approach. *See Deutsche Post Glob. Mail, Ltd. v. Conrad*, 292 F. Supp. 2d 748, 754 (D. Md. 2003) (interpreting Maryland law as permitting courts to "blue-pencil" "language from restrictive covenants"); *Fowler v. Printers II, Inc.*, 598 A.2d 794, 800 (Md. Ct. Spec. App. 1991); *United Rentals, Inc. v. Davison*, 2002 WL 31994250, at *3– 5 (Md. Cir. Ct. July 23, 2002).

Other jurisdictions have criticized the blue-pencil doctrine as an overly formalistic approach to judicial modification of an agreement. *See, e.g.*, *Data Mgmt., Inc. v. Greene*, 757 P.2d 62, 64 (Alaska 1988) (referring to the blue-pencil doctrine as "too mechanical, in that it values the wording of the contract over its substance");[6] *Bess v. Bothman*, 257 N.W.2d 791, 795 (Minn. 1977). A number of scholarly writers share the same reservation,[7] and the Restatement of Contracts does not adopt this approach. Restatement (Second) Contracts § 184, Reporter's Note (1981). Jurisdictions that adopt equitable reformation recognize that in certain circumstances, there are valid justifications for enforcing part of a restrictive covenant, but the covenant's language "does not lend itself to the mechanical blue-pencil modification." *Durapin, Inc. v. Am. Prods.*, 559 A.2d

---

[6] The court in *Data Mgmt., Inc.* provided the following illustration to highlight the drawback of the blue-pencil doctrine's rigidity:

> if a seller promised not to compete "anywhere in England," the whole provision would be void because the quoted clause cannot be narrowed by deleting any words. On the other hand, if the seller promised not to compete "in London or elsewhere in England," the covenant would be enforceable as to London because "elsewhere in England" could be "blue pencilled."

*Id.* at 64. The court found the difference between each promise to be "merely semantic" and thus rejected the blue-pencil rule. *Id.*

[7] *See* 15 Grace McLane Geisel, *Corbin on Contracts* § 80.26 (Joseph M. Perillo ed., rev. ed. 2003); 6 Samuel Williston & Richard Lord, *A Treatise on the Law of Contracts* § 13:26 (4th ed. 2009).

1051, 1053 (R.I. 1989) (citing *E. Distrib. Co. v. Flynn*, 567 P.2d 1371, 1379 (Kan. 1977)).

We join the jurisdictions that have adopted the equitable reformation doctrine. Although we look to Maryland common law for guidance where "there is no District of Columbia precedent on an issue,"[8] we are persuaded, consistent with the Restatement of Contracts,[9] that the doctrine of equitable reformation affords greater flexibility to make reasonable modifications when necessary and is thus the better approach.

In adopting equitable reformation, however, we remain "cognizant of the judicial reluctance to 'rewrite' contracts between parties . . . and [of] the argument which suggests that partial enforcement rewards employers who have everything to gain from writing overbroad covenants." *Ellis*, 565 A.2d at 617.[10] Although there

---

[8] *E.g. Schoonover v. Chavous*, 974 A.2d 876, 882 n.5 (D.C. 2009); *George Wash. Univ. v. Scott*, 711 A.2d 1257, 1260 n.5 (D.C. 1998); *Napolean v. Heard*, 455 A.2d 901, 903 (D.C. 1983).

[9] *Ellis v. James V. Hurson Assoc., Inc.*, 565 A.2d at 618 & n.12.

[10] Along with a hesitance to rewrite contracts and the criticism that the application of equitable reformation encourages employers to draft overbroad noncompete clauses with confidence that they will be salvaged by the court and enforced when challenged, courts and commentators note an "in terrorem effect on employees who respect their contractual obligations and on competitors who fear legal complications if they employ a covenantor[.]" Kenneth R. Swift, *Void*

(continued…)

appears to be a trend toward adopting equitable reformation where courts entertain judicial modification of unreasonable covenants, there also appears to be a trend among courts "indicat[ing] a greater willingness to refuse to reform agreements that are not reasonable on their face." *Golden Rd. Motor Inn v. Islam*, 376 P.3d 151, 159 (Nev. 2016) (quoting Griffin Toronjo Pivateau, *Putting The Blue Pencil Down: An Argument for Specificity in Noncompete Agreements*, 86 Neb. L. Rev. 672, 674 (2008)).  We are persuaded to adopt equitable reformation more by the argument that the blue-pencil doctrine can be too rigid and technical an approach than by any suggestion that courts should be at liberty to wholesale rewrite overbroad clauses.

The Restatement sets forth relevant principles aimed at these concerns.  *Ellis*

---

(…continued)

*Agreements, Knocked-Out Terms, and Blue Pencils: Judicial and Legislative Handling of Unreasonable Terms in Noncompete Agreements*, 24 Hofstra Lab. & Emp. L.J. 223, 246–47 (2007) (quoting Blake, *Employee Agreements Not To Compete*, 73 Harv. L Rev. 625, 682–83 (1960)); *see also Montel Aetnastak, Inc., v. Miessen*, 998 F. Supp. 2d 694, 718 (N.D. Ill. 2014) (noting that modification may "have a severe chilling effect on employee post-termination activities, since the average employee cannot be expected to anticipate [the] enforceability of restrictive covenants").  Accordingly, some courts have held that where a significant modification to the noncompete clause would be necessary to make it comport with the law, or where essential elements of a contract must be supplied, extensive judicial reformation may run counter to public policy.  *See Montel Aetnastak*, 998 F. Supp. 2d at 718; *Bayly, Martin & Fay, Inc. v. Pickard*, 780 P.2d 1168, 1175 (Okla. 1989) (citing *Medline Indus., Inc. v. Grubb*, 670 F. Supp. 831, 837 (N.D. Ill. 1987)).

*v. James V. Hurson Assocs., Inc.*, 565 A.2d at 617. Where less than all of a covenant is unenforceable on public policy grounds, for example, a court may exercise discretion to enforce the rest of the covenant where the party seeking equitable reformation made the agreement "in good faith and in accordance with reasonable standards of fair dealing" and where, "in the course of determining what part of the term to enforce," the court does not "add to the scope of the term in any way." Restatement (Second) of Contracts § 184 (1981); *id.* at § 184 cmt. b. When determining whether and how to modify a facially overbroad noncompete clause, a relevant consideration is "whether modified enforcement is possible without injury to the public and without injustice to the parties themselves." 15 Grace McLane Geisel, *Corbin on Contracts* § 89.26 (Joseph M. Perillo ed., rev. ed. 2003).

Similarly, many courts review with stricter scrutiny a decision to reform an agreement to make it reasonable where doing so would require a substantial rewrite of the contract or where the court would be called upon to supply essential terms. *See AMX Int'l, Inc. v. Battelle Energy All.*, 744 F. Supp. 2d 1087, 1095 (D. Idaho 2010*); Stonhard, Inc. v. Carolina Flooring Specialists, Inc.*, 621 S.E.2d 352, 354 (S.C. 2005); *Bayly, Martin & Fay, Inc. v. Pickard*, 780 P.2d at 1175; *see also Eichmann v. Nat'l Hosp. & Health Care Servs.*, 719 N.E.2d 1141, 1149 (Ill. App. Ct. 1999) (declining to modify an injunction where "[d]ue to the significant

deficiencies of the restrictive covenants here, drastic modifications, rather than minor ones, would be necessary and that would be tantamount to fashioning a new agreement"); *Ehlers v. Iowa Warehouse Co.*, 188 N.W.2d 368, 373–74 (Iowa 1971) (noting that a covenant may be "so broad as to constitute bad faith"). This heightened level of scrutiny stems from an interest in encouraging specificity of drafting. *See Eichmann*, 719 N.E.2d at 1149; *Elam v. Monarch Life Ins. Co.*, 598 A.2d 1167, 1171 n.8 (D.C. 1991) (reiterating the importance of precision in drafting). The assertion of a legitimate interest does not automatically require the court to reform a covenant that was not drafted to properly protect that interest in the first place.

### B.    Application of the Doctrine and Enforceability of the Injunction

The Steiners argue that even if the trial court did not err by adopting the equitable reformation doctrine to modify their contract, the trial court "created an injunction contrary to D.C. law" by imposing "more expansive restraints" than those contained in the language of the contract. The Steiners similarly challenge the trial court's decision to include in the preliminary injunction select language from the employment contract's noninterference clause. We review a court's decision whether to judicially modify an unenforceable noncompete clause for an abuse of discretion, and we consider de novo a court's interpretation of a contract

subjected to equitable reformation. *See Ellis*, 565 A.2d at 618; *Wilson v. Hayes*, 77 A.3d 392, 402 (D.C. 2013).

The contract between the Steiners and Rabbi Shemtov included a noncompete clause stating that, in the event of termination for whatever reason, the parties agreed that "they will not enter into employment or arrangement—of whatever scope or duration—with any Chabad-Lubavitch entity or any other institution, performing similar work, anywhere in DC, or suburban MD or VA." The contract further included a noninterference clause stating:

> Upon completion of their employment . . . [appellants] agree to conclude their operations at GWU peacefully within 30 days of notification, and without causing any damage or discomfort to [appellees], or interfering with any arrangement or subsequent decision made by [appellees] in connection with GWU or any other activities over which [appellees] had authority.

At an initial hearing on the appellees' request for a preliminary injunction, the trial court found that the appellees "essentially concede[d] that the noncompete clause as written in the contract of August 6, 2012, [was] greater in both scope and duration than necessary to protect their legitimate interests," and made no findings on the enforceability of the noninterference clause. The trial court then modified the noncompete clause twice in attempts to render the clause enforceable through a preliminary injunction—once following the initial hearing, and a second time on a

remand.[11]

Ultimately, the court issued a modified preliminary injunction that read into the noncompete clause a durational limit of two years, a geographical limit of roughly one mile from GW's campus, a restriction that the noncompete only apply to the Steiners' interaction with "currently enrolled GWU students," and a list of activities that the Steiners were prohibited from engaging in. In addition, the court enforced the noninterference provision by ordering that the Steiners "shall not interfere with any arrangement or subsequent decisions made by the [appellees] in connection with GWU or other activities of the [appellees]."

### 1. The Noncompete Clause

The Steiners challenge the validity of both provisions. They focus their argument against the noncompete clause on the court's interpretation of "enter[ing] into employment or arrangement . . . with any Chabad-Lubavitch entity or other institution, performing similar work" as prohibiting any activities the Steiners

---

[11] The first preliminary injunction enjoined the Steiners from engaging in various forms of religious outreach within one mile of GW. Following oral argument on a motion to stay before this court, we remanded to clarify the scope of the injunction, as well as the record on a separate issue. On remand the trial court, among other changes, further modified the injunction to enjoin the Steiners from engaging with currently enrolled GW students.

previously performed,[12] whether in a personal capacity or an organizational capacity. The Steiners contend that by modifying the clause in such a way, the trial court ignored key limitations in the written language of the covenant, thereby creating a broader restriction than that envisioned in the contract.

We agree with the Steiners that the noncompete clause as interpreted in and enforced by the modified preliminary injunction is broader than the terms of the original agreement. When signing the employment contract, the Steiners agreed not to "enter into employment or arrangement—of whatever scope or duration— with any Chabad-Lubavitch entity or other institution, performing similar work." The most natural reading of these terms is that the Steiners agreed not to join any preexisting Chabad-Lubavitch organization that, like AFL, provides religious guidance. "Entity" and "institution" are both defined as organizational structures,[13]

---

[12] Namely, the trial court pasted in the section of the contract that read, "[a]s part of the above mentioned campus activities, [the defendants] will work diligently to organize as many programs as possible normally associated with this type of shlichus: Shabbos dinners on Friday night, shiurim [classes] for students (public and private[)], energetic learning programs, activities in advance of and on the Yomim Toivim [holidays], annual Israel trips for students . . . social events to enable Jewish students to interact with each other as much as possible, etc. Speakers will be brought in periodically . . .".

[13] "Entity" is defined as "independent, separate, or self-contained existence," or "something that has objective or physical reality and distinctness of being and character." *Webster's Third New International Dictionary* 758 (2002). "Institution" is defined as "an established society or corporation." *Id.* at 1171.

and to "enter into employment or arrangement" suggests joining an organization already formed, rather than creating one's own.[14] What the language in the employment contract does not capture is what the modified preliminary injunction specifically prohibits: organizing dinners or religious activities on their own time, not necessarily in any employment capacity, and not necessarily for any organization—preexisting or otherwise. From the plain language of the contract, therefore, the trial court impermissibly expanded the scope of the covenant not to compete.

The trial court repeatedly raised this same concern. Though it ultimately modified the parties' agreement to read a list of prohibited activities into the "employment or arrangement" language of the noncompete, the court expressed reservations that the provisions in question seemed to be focused on entities and organizations and that an alternative reading enjoining personal activities might be broader than the scope of the clause as written. In the words of the court, "It's not necessarily what makes sense. It's not necessarily what Rabbi Shemtov, or anybody else in his position would have wanted . . . the result to be . . . . It's about does this document say that."

---

[14] "Enter into" is defined as "to make oneself a party to or in," or "to form a constituent part or element of." *Webster's Third New International Dictionary* 757 (2002).

Appellees argue that any claim that the plain language of the noncompete is limited to an employment relationship is "rebutted by the broad language actually contained in the clause," emphasizing the phrase "similar work." But in at least one important respect it was the breadth of this clause that precluded the trial court from reforming the noncompete as it did. Where covenants not to compete contain "vague terms or ambiguities," the court must construe the language against the employer. *Pais v. Automation Prods., Inc.*, 36 Va. Cir. 230, 236 (Va. Cir. Ct. 1995); *Dyer v. Bilaal*, 983 A.2d 349, 355 (D.C. 2009) (holding that ambiguity in a contract will be construed against the drafter); *see also Gryce v. Lavine*, 675 A.2d 67, 70 (D.C. 1996) ("The law in general . . . view[s] covenants not to compete with some suspicion."). Upholding the modification here would discourage the "precise draftsmanship which should be reflected in written agreements." *Eichmann*, 719 N.E.2d at 1149 (quoting *Lee/O'Keefe Ins. Agency, Inc. v. Ferega*, 516 N.E.2d 1313, 1319 (Ill. App. Ct. 1987)); *see also Elam*, 598 A.2d at 1171 n.8.

The interest in precise drafting is of particular importance where, as here, the restriction has a greater than usual effect on the public interest, as well as on the rights of employees to engage in activities outside of the employment context. Appellees urge us to view this as a dispute no different from any other that might arise out of a profit-focused business conflict. But this case is unlike any cited to us by either party in that it involves an agreement between an employee and a

nonprofit organization,[15] serving a "client base" comprised of college students, operating to fulfill a mission focused on providing religious guidance, rather than, at least to some degree, generating a profit.

Here, the public undoubtedly has an interest in the "restraint of trade" at issue. More than 100 GW students signed a petition attesting to the special personal relationship they shared with their religious leader, Rabbi Steiner.[16] In such circumstances, the public interest may bear on the level of scrutiny we will apply to a decision to judicially modify a restrictive covenant. Other courts have likewise held that, in certain professions based on personal relationships, the customers' interest weighs more heavily against equitable enforcement of noncompete agreements. *See, e.g.*, *Lowe v. Reynolds*, 428 N.Y.S.2d 358, 359 (N.Y. App. Div. 1980) (holding a noncompete agreement unenforceable against a specialized speech and hearing pathologist due to the importance of the "personal relationship" involved); *Valley Med. Specialists v. Farber*, 982 P.2d 1277, 1283

---

[15] *Cf. Hope Found., Inc. v. Edwards*, No. 1:06-cv-0439-DFH-TAB, 2006 WL 3247141, at *10 (S.D. Ind. Apr. 12, 2006) (holding that the court should consider an organization's not-for-profit status as part of relevant circumstances in analyzing the enforceability of a noncompete clause).

[16] The petition read, in part: "A new additional rabbi may prove effective in cultivating relationships with some of the many members of the Jewish student body who lack but would appreciate a rabbi figure in their lives. But the special rapport that we and other students and alumni enjoy with Rabbi Steiner is not something that can be replaced by a substitute, however competent."

(Ariz. 1999) (en banc) (holding that "the doctor-patient relationship is special and entitled to unique protection" because "[i]t cannot be easily or accurately compared to relationships in the commercial context" and that such agreements should be "strictly construed for reasonableness"); *Hope Found.*, 1:06–cv–0439–DFH–TAB, 2006 WL 3247141, at \*17 (holding a noncompete clause unenforceable against a doctor responsible for training educators, where an injunction would deny education professionals and students "their choice of service providers"); *Columbus Med. Servs., LLC v. David Thomas & Liberty Healthcare Corp.*, 308 S.W.3d 368, 393–94 (Tenn. Ct. App. 2009) (holding a noncompete agreement unenforceable against therapist defendants even where the relief requested was monetary).

In this same vein, the profession of religious minister or rabbi is unique in that the tasks performed in an employment context overlap to a large extent with actions such a professional might undertake in his or her free time, without expectation of payment, as a member of the community engaging in religious practice or dialogue. It is thus imperative that an employer wishing to prohibit certain behavior post-termination narrowly tailor with specific language a restrictive covenant that will protect their stated interests, rather than thrust upon the court a facially unenforceable covenant that might be broad enough to include a reasonable restriction once modified.

With respect to the covenant before us, we decline to depart from the plain language of the noncompete clause to enforce restrictions, pursuant to a breach of contract claim, that appellees would have liked to, but failed to, put in place. We therefore hold that the trial court erred by modifying the noncompete clause to prohibit activities conducted by the appellants in a personal capacity. At the same time, the Steiners have given us no reason to question the propriety of the geographical and durational limitations imposed by the injunction.[17]

## 2. The Noninterference Clause

The Steiners also challenge the noninterference clause included in the preliminary injunction as an unwarranted, overbroad, and vague restraint. We are unable to discern from the record what specifically the Steiners are prohibited from doing when ordered not to "interfere with any arrangement or subsequent decisions made by [appellees] in connection with GWU or other activities of the [appellees]." Whatever the clause was intended to mean, noninterference clauses, like noncompete clauses, are subject to reasonableness requirements. *See Loral Corp. v. Moyes*, 174 Cal. App. 3d 268, 279 (Cal. Ct. App. 1985) (treating a

---

[17] Appellants ask us to hold that noncompete clauses imposed on religious ministers are unenforceable as a matter of law. Because we conclude that the trial court erred by reforming the covenant in this instance, we need not address that contention.

noninterference agreement not to solicit former co-workers to leave the employer as a nonsolicitation agreement, and holding that "the potential impact on trade must be considered before invalidating a noninterference agreement."). Presumably, as it is included as a distinct clause in the order, separate and apart from the modified noncompete provision, the trial court interpreted the clause to prohibit a different set of activities. And likewise, as this clause originally appears in the contract following the Steiners' explicit agreement to "conclude their operations at GWU peacefully," this clause might naturally suggest an agreement not to interfere with AFL through continued association. We remand for clarification as to what this clause is intended to enforce and for a determination as to whether the clause is enforceable.

## IV.    Conclusion

For the reasons stated in this opinion, we vacate the modified preliminary injunction order and remand to allow the trial court to assess whether and how to enforce the employment contract consistent with this opinion. On remand, the trial court should also assess whether Rivky Steiner, Rabbi Steiner's wife, is properly enjoined in any preliminary injunction that remains in force. Ms. Steiner asserted that she was not a party to the contract and reiterated this argument throughout ensuing hearings, but the trial court never addressed whether the relevant

preliminary injunction factors were satisfied as to her. *E.g.*, *Wieck v. Sterenbuch*, 350 A.2d 384, 387 (D.C. 1976) (outlining the four preliminary injunction factors); *see In re Estate of Reilly*, 933 A.2d 830, 834–35 (D.C. 2007) (our role on appeal includes "assuring that the trial court's analysis reflects a resolution of all the issues which necessarily underlie the issuance of an injunction").

*So ordered.*